# ORIGINAL

13
4-11-01
Sc

FILED
HARRISBURG

APR 1 0 2001

MARY E. D'ANDREA, CLERK
Per_____ DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN RICHARD JAE,                    :
                                     :
              Plaintiffs             :    Civil Action No. 01-CV-0041
                                     :
       v.                            :    Judge Rambo
                                     :
C.O. LESTER,                         :    (Magistrate Judge Smyser)
                                     :
              Defendant              :

### DEFENDANT'S BRIEF IN SUPPORT OF MOTION
### TO REVOKE PLAINTIFF'S IN FORMA PAUPERIS STATUS

**Identity of the Parties and Nature of the Action**

Plaintiff, John Richard Jae, is an inmate currently confined at the State Correctional Institution at Greene (SCI-Greene). In August 2000, Plaintiff was incarcerated at the State Correctional Institution at Camp Hill (SCI-Camp Hill). Defendant, Corrections Officer Lester, is employed at SCI-Camp Hill.

Plaintiff's Complaint is brought pursuant to 42 U.S.C. § 1983 and alleges that the Defendant violated Plaintiff's Eighth Amendment rights by subjecting him to physical assault, wanton and deliberate infliction of bodily pain and emotional injury. Plaintiff requests relief in the form of declaratory judgment, as well as compensatory and punitive damages.

## Relevant Procedural History

On January 1, 2001, Plaintiff filed the above-captioned Complaint. On January 25, 2001, the Court granted Plaintiff's Request to Proceed In Forma Pauperis. On February 22, 2001, the Court issued a Case Management Order in the above-captioned matter. On March 27, 2001, Defendant Lester filed a Motion to Revoke Plaintiff's IFP. This Brief is filed in support of Defendant's Motion.

## Statement of Facts

Plaintiff alleges that on August 23, 2000, Defendant Lester threatened to assault him. (Complaint, ¶1) Also on this date, Defendant Lester escorted Plaintiff to the Restricted Housing Unit (RHU) property room to exchange his legal and religious materials. (Complaint, ¶ 2) Plaintiff claims upon arriving at the back hallway of the RHU, Defendant Lester shoved Plaintiff into the concrete wall, face first and hit Plaintiff twice on the back of his head and on his lower back. (Complaint, ¶ 4) During the alleged assault, Plaintiff was handcuffed to a security belt. (Complaint, ¶ 5) Plaintiff claims he suffered a bruise on his lower right back and soreness on his head. (Complaint, ¶ 7) Plaintiff further claims that Defendant Lester threatened to assault him on several dates following August 23, 2000. (Complaint, ¶ 8)

2

## QUESTIONS PRESENTED

I.   **WHETHER PLAINTIFF'S I.F.P. STATUS SHOULD BE REVOKED PURSUANT TO 28 U.S.C. §1915(G) BECAUSE MORE THAN THREE OF HIS FEDERAL COMPLAINTS HAVE BEEN DEEMED FRIVOLOUS, MALICIOUS, OR FAILED TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED?**

Suggested Answer: Yes

II.  **WHETHER PLAINTIFF'S I.F.P. STATUS SHOULD BE REVOKED PURSUANT TO 28 U.S.C. §1915(G) BECAUSE PLAINTIFF WAS NOT UNDER IMMINENT DANGER OF SERIOUS PHYSICAL INJURY AT THE TIME THE COMPLAINT WAS FILED?**

Suggested Answer: Yes

## ARGUMENT

In 1995, Congress passed the Prisoner Litigation Reform Act to help curb frivolous prisoner litigation from congesting the Federal Courts' dockets. Included in the Act is the "three strikes provision" of 28 U.S.C. §1915(g), which provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is in imminent danger of serious physical injury.[1]

Congress' intent was to discourage the filing of frivolous I.F.P. lawsuits, such that "[i]f a litigant abuses the I.F.P. privilege, as evidenced by three strikes (dismissals for frivolousness), §1915(g) has the effect of delaying litigation of the merits of a claim

---

[1]  This Court has recognized, in a case involving Plaintiff Jae, that pursuant to U.S.C. §1915(g) plaintiff has had at least three cases or appeals dismissed as frivolous. In fact as of April 1999, Plaintiff had twelve prior cases or appeals dismissed as frivolous. (See *Jae v. Glenny, et al.* 1:CV-98-0115, Magistrate Judge Smyser's Memorandum and Order

3

until the fee is paid in full." *Banos v. O'Guin*, 144 F.3d 883, 885 (5th Cir. 1998)(citing H.R.REP., No 104-21, §202, at 22 (1995)(noting "Too many frivolous lawsuits are clogging the courts, seriously undermining the administration of justice.") Accord *Ashley v. Dilworth*, 147 F.3d 715, (8th Cir. 1998)(stressing that "the Act does not close the courthouse doors to prisoners who frequently file frivolous lawsuits; rather, it merely makes them pay the full ordinary filing fees sooner rather than later.")

Congress did build a safety value into the statute, allowing an inmate with three or more strikes to obtain I.F.P. status if he alleges or proves "imminent danger of serious physical injury." 28 U.S.C. §1915(g). Accordingly, to revoke a plaintiff's I.F.P. status under §1915(g), a defendant must prove to the Court that Plaintiff is an inmate who has had three or more federal complaints deemed frivolous, malicious, or that failed to state a claim upon which relief may be granted. In addition, the Plaintiff must not have been under imminent danger of serious physical injury at the time of the complaint was filed.

**II.    Plaintiff was not under imminent danger of serious physical injury at the time he filed the Complaint in this matter.**

In determining whether Plaintiff faced imminent danger, the Court must focus on whether the allegation is credible as of the time the complaint was filed and not as of the time of the alleged incident. The Third Circuit recently determined that a prisoner may invoke the "imminent danger" exception only to seek relief from imminent danger of serious physical injury at the time the complaint is filed. *Abdul Akdar v. McKelvie*,

dated April 21, 1999, attached hereto as Exhibit A.)

2001 WL 76277 (3rd Cir.(Del.)). [2]  Therefore, if a defendant challenges the allegations

of imminent danger, the district court must determine whether plaintiff's allegation is

credible as of the time the complaint was filed with the Court.

A district court is empowered to revoke I.F.P. status if the defendant discredits

factual claims of imminent danger that are 'clearly baseless,' i.e., allegations that are

fantastic or delusional and rise to the level of the 'irrational or wholly incredible'"

*Gibbs v. Cross*, 160 F.3d 962, 967 (3rd Cir. 1998)(quoting *Denton v. Hernandez*, 504

U.S. 25, 33, 112 S.Ct. 1728, 1733 (1992)).  In this case, however, Plaintiff's

complaint completely fails to demonstrate that he faced imminent danger of serious

bodily harm at the time he filed the complaint.

Plaintiff complaint filed in January of this year, alleges that on August 23, 2000,

Defendant Lester threatened to assault him. (Complaint, ¶1)  Defendant Lester escorted

Plaintiff to the RHU property room to exchange his legal and religious materials.  (Complaint,

¶ 2)  Plaintiff claims upon arriving at the back hallway of the RHU, Defendant Lester shoved

Plaintiff into the concrete wall, face first and hit Plaintiff twice on the back of his head and on

his lower right back.  (Complaint, ¶ 4)  Plaintiff further claims that Defendant Lester

threatened to assault him on several dates following August 23, 2000.  (Complaint, ¶ 8)

Plaintiff has previously filed at least twelve actions in federal court that were

dismissed as frivolous, malicious, or failed to state a claim upon which relief may be

granted. (See Exhibit A).  Plaintiff failed to alleged that he was under imminent danger

---

[2] The Third Circuit overruled the previous interpretation of "imminent danger of serious physical injury" as provided in *Gibbs v. Roman*, 116 F.3d 83 (3d Cir. 1997) and followed the construction set forth by the Fifth, Eighth and Eleventh Circuits.

of serious physical injury when he filed his complaint. Instead his complaint, which was, filed on January 18, 2001, five months after the alleged incident and threats made in August 2000. In fact, Plaintiff was incarcerated at a SCI-Greene, located in Greene County, Pennsylvania, when he filed his complaint regarding allegations at SCI-Camp Hill, located in Cumberland County. Therefore, pursuant to the three-strikes provision of §1915(g) Plaintiff fails to allege imminent danger at the time his complaint was filed.

## CONCLUSION

For the foregoing reasons, Defendant requests that this Court revoke Plaintiff's I.F.P. status and order Plaintiff to pay the full amount of any filing fee before Plaintiff can commence this action.

Respectfully submitted,

Victoria S. Freimuth
Assistant Counsel
Attorney Id No. 77183

Pa. Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, Pa. 17001
(717) 731 - 0444

Dated: April 10, 2001

6

2001 WL 76277
--- F.3d ---
(Cite as: 2001 WL 76277 (3rd Cir.(Del.)))

Only the Westlaw citation is currently available.

United States Court of Appeals, Third Circuit.

Debro S. **ABDUL-AKBAR,** Appellant,
v.
Roderick R. McKELVIE, Honorable; James
Collins; James D. Tyndall; Earl Messick;
Turrit, Capt.; Melvin Henessey; Michael Deloy; Joe
Johnson, Lt.; Stephen H.
Smyk.

No. 98-7307.

Submitted Under Third Circuit LAR 34.1(a) Feb.
18, 2000.
Argued Nov. 1, 2000.
Jan. 29, 2001.

Prisoner moved for leave to file § 1983 complaint, and filed proposed complaint and motion to proceed in forma pauperis. The United States District Court for the District of Delaware, Roderick R. McKelvie, J., denied motion to proceed in forma pauperis. Prisoner appealed. The en banc Court of Appeals, Aldisert, Circuit Judge, held that: (1) prisoner may invoke imminent danger exception to Prison Litigation Reform Act's (PLRA) three strikes rule only to seek relief from a danger which is imminent at the time the complaint is filed; overruling Gibbs v. Roman, 116 F.3d 83, and (2) three strikes rule, interpreted so as to allow invocation of imminent danger exception only when danger exists at time of filing, did not violate equal protection.

Affirmed.

Mansmann, Circuit Judge, dissented and filed a separate opinion in which Sloviter, Nygaard, and McKee, Circuit Judges, joined.

[1] Federal Courts ⬩585.1

170Bk585.1

Order denying leave to proceed in forma pauperis is a final, collateral order that is immediately appealable. 28 U.S.C.A. § 1291.

[2] Federal Courts ⬩776
170Bk776

Court of Appeals reviews de novo issues of statutory interpretation and the constitutionality of a statute.

[3] Federal Civil Procedure ⬩2734
170Ak2734

Imminent danger exception to Prison Litigation Reform Act's (PLRA) three strikes rule, which generally bars from proceeding in forma pauperis prisoner who has abused judicial system by filing frivolous actions, may be invoked by prisoner only to seek relief from a danger which is imminent at the time the complaint is filed; overruling Gibbs v. Roman, 116 F.3d 83. 28 U.S.C.A. § 1915(g).

[4] Statutes ⬩188
361k188

If the language of statute is plain, the sole function of the court is to enforce the statute according to its terms.

[5] Statutes ⬩188
361k188

[5] Statutes ⬩189
361k189

Statute's plain meaning is conclusive, except in rare cases in which literal application of statute will produce a result demonstrably at odds with the intentions of its drafters.

[6] Convicts ⬩6
98k6

Prison Litigation Reform Act (PLRA) requires that plaintiff exhaust administrative remedies, but only if plaintiff is prisoner at the time of filing. 42 U.S.C.A. § 1997e(a).

[7] Convicts ⬩6
98k6

Applicability of Prison Litigation Reform Act's (PLRA) personal injury requirement for prisoner claims for mental or emotional injury turns on plaintiff's status as a prisoner, not at the time of underlying incident, but when the lawsuit is filed. 42 U.S.C.A. § 1997e(e).

[8] Convicts ⬩6

2001 WL 76277
(Cite as: 2001 WL 76277 (3rd Cir.(Del.)))

98k6

Need for district court to screen complaint in a civil action filed by prisoner looks to prisoner's status when case is filed. 28 U.S.C.A. § 1915A.

[9] Convicts ⬤══6
98k6

Congress enacted Prison Litigation Reform Act (PLRA) to limit the filing of frivolous and vexatious prisoner lawsuits. 28 U.S.C.A. § 1915.

[10] Federal Civil Procedure ⬤══2734
170Ak2734

Three strikes rule imposed by Prison Litigation Reform Act (PLRA) does not block prisoner's access to the federal courts; it only denies prisoner the privilege of filing before he has acquired the necessary filing fee by generally denying in forma pauperis privilege to prisoners who have, on three occasions, abused judicial system by filing frivolous or malicious lawsuits or appeals. 28 U.S.C.A. § 1915(g).

[11] Federal Courts ⬤══5
170Bk5

Federal courts do not have unlimited power and authority, but are limited to that which has been granted by Congress.

[12] Federal Civil Procedure ⬤══2734
170Ak2734

Litigant's ability to proceed in forma pauperis is not a constitutional right, and Congress has the power to limit this statutorily created right.

[13] Federal Courts ⬤══915
170Bk915

Appellant waived argument when he failed to raise it in his opening brief on appeal.

[14] Constitutional Law ⬤══253.2(2)
92k253.2(2)

Although the Fifth Amendment contains no Equal Protection Clause, the Fifth Amendment's Due Process Clause prohibits the federal government from engaging in discrimination that is so

unjustifiable as to be violative of due process, and thus has been construed to contain equal protection guarantee. U.S.C.A. Const.Amends. 5, 14.

[15] Constitutional Law ⬤══253.2(2)
92k253.2(2)

Fifth Amendment equal protection claims are examined under the same principles that apply to such claims under the Fourteenth Amendment. U.S.C.A. Const.Amends. 5, 14.

[16] Constitutional Law ⬤══213.1(1)
92k213.1(1)

[16] Constitutional Law ⬤══213.1(2)
92k213.1(2)

Statutes that substantially burden a fundamental right or target a suspect class must be reviewed on equal protection challenge under strict scrutiny; that is, to survive, they must be narrowly tailored to serve a compelling governmental interest. U.S.C.A. Const.Amend. 14.

[17] Constitutional Law ⬤══213.1(2)
92k213.1(2)

[17] Constitutional Law ⬤══253.2(3)
92k253.2(3)

If statute neither burdens a fundamental right nor targets a suspect class, it does not violate the Fourteenth Amendment's Equal Protection Clause, as incorporated through the Fifth Amendment's Due Process Clause, so long as it bears a rational relationship to some legitimate end. U.S.C.A. Const.Amends. 5, 14.

[18] Constitutional Law ⬤══213.1(1)
92k213.1(1)

[18] Constitutional Law ⬤══250.3(2)
92k250.3(2)

Neither prisoners nor indigents are suspect classes for equal protection purposes. U.S.C.A. Const.Amend. 14.

[19] Constitutional Law ⬤══248(2)
92k248(2)

Prison Litigation Reform Act's (PLRA) three strikes

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

rule, interpreted so as to permit prisoner barred from proceeding in forma pauperis due to prior abuse of judicial system to invoke "imminent danger" exception only to seek relief from danger imminent at time of complaint filing, did not implicate fundamental right of access to the courts of prisoner subject to rule's restrictions, so as to require strict scrutiny review of statute in deciding prisoner's equal protection challenge; prisoner was not barred from filing action, but rather simply could not enjoy benefits of proceeding in forma pauperis in federal court. U.S.C.A. Const.Amend. 5 ; 28 U.S.C.A. § 1915(g).

[20] Constitutional Law ⬤⬅328
92k328

Right of access to the courts is not absolute.

[21] Federal Civil Procedure ⬤⬅2734
170Ak2734

Merely requiring prisoner to pay filing fees in a civil case does not, standing alone, violate that prisoner's right of meaningful access to the courts. 28 U.S.C.A. § 1915(g).

[22] Constitutional Law ⬤⬅328
92k328

An unconditional right of access to the courts exists for civil cases only when denial of a judicial forum would implicate a fundamental human interest, such as the termination of parental rights or the ability to obtain a divorce.

[23] Courts ⬤⬅489(1)
106k489(1)

State courts have concurrent jurisdiction over § 1983 cases. 42 U.S.C.A. § 1983.

[24] Courts ⬤⬅489(1)
106k489(1)

A state court provides a fully adequate forum for the vindication of civil rights claims.

[25] Constitutional Law ⬤⬅248(2)
92k248(2)

Prison Litigation Reform Act's (PLRA) three strikes rule, interpreted so as to permit prisoner barred

from proceeding in forma pauperis due to prior abuse of judicial system to invoke "imminent danger" exception only to seek relief from danger imminent at time of complaint filing, was rationally related to congressional goals of putting in place economic incentives that would prompt prisoners to "stop and think" before filing civil complaint, and temporal restriction on invocation of exception rationally balanced goals of rule with need of prisoners facing imminent harm to file immediately; statute thus did not violate equal protection. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 1915(g).

[25] Federal Civil Procedure ⬤⬅3
170Ak3

Prison Litigation Reform Act's (PLRA) three strikes rule, interpreted so as to permit prisoner barred from proceeding in forma pauperis due to prior abuse of judicial system to invoke "imminent danger" exception only to seek relief from danger imminent at time of complaint filing, was rationally related to congressional goals of putting in place economic incentives that would prompt prisoners to "stop and think" before filing civil complaint, and temporal restriction on invocation of exception rationally balanced goals of rule with need of prisoners facing imminent harm to file immediately; statute thus did not violate equal protection. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 1915(g).

[26] Constitutional Law ⬤⬅328
92k328

Right of access to federal courts is not a free floating right, but rather is subject to Congress' Article III power to set limits on federal jurisdiction. U.S.C.A. Const.Art. 3, § 1 et seq.

[26] Federal Courts ⬤⬅5
170Bk5

Right of access to federal courts is not a free floating right, but rather is subject to Congress' Article III power to set limits on federal jurisdiction. U.S.C.A. Const.Art. 3, § 1 et seq.

[27] Constitutional Law ⬤⬅213.1(2)
92k213.1(2)

Equal protection constraints, under rational basis review, require neither a perfect nor even best available fit between statute's goal and the means

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00041-SHR    Document 13    Filed 04/10/2001    Page 10 of 51

employed in that statute to further that goal. U.S.C.A. Const.Amend. 14.

On Appeal from the United States District Court for the District for Delaware, (D.C.Civ. No. 98-CV-00137), District Judge: Honorable Roderick R. McKelvie.

Jerold S. Solovy, Barry Levenstam, (argued), Paul M. Smith, Jessie K. Liu, Jenner & Block, Chicago, IL, Attorneys for Appellant.

Carl Schnee, United States Attorney, Keith M. Rosen (argued), Assistant United States Attorney, Wilmington, DE, Attorneys for Appellee, Hon. Roderick R. McKelvie.

Loren C. Meyers, Chief of Appeals Division, Robert F. Phillips (argued), Deputy Attorney General, Stuart B. Drowos, Deputy Attorney General, Delaware Department of Justice, Wilmington, DE, Attorneys for Appellees, James Collins; James Tyndall; Earl Messick; Turrit, Capt.; Melvin Henessey; Michael Deloy; Joe Johnson, Lt.; Stephen Smyk.

D. Michael Fisher, Attorney General, John G. Knorr, III, Chief Deputy Attorney General, Chief, Appellate Litigation Section, Calvin R. Coons, Senior Deputy Attorney General, Office of the Attorney General of Pennsylvania, Harrisburg, PA, Attorneys for Commonwealth of Pennsylvania, Amicus Curiae.

Before: BECKER, Chief Judge, SLOVITER, MANSMANN, SCIRICA, NYGAARD, ALITO, ROTH, McKEE, RENDELL, BARRY, AMBRO, FUENTES and ALDISERT, Circuit Judges.

OPINION OF THE COURT

ALDISERT, Circuit Judge.

**\*1** The primary issue for decision is whether we should overrule the holding of Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997), interpreting 28 U.S.C. S 1915(g). Under this statute, popularly known as the "three strikes" rule, a prisoner may not file a new action or appeal in forma pauperis ("I.F.P.") if, on three or more prior occasions while incarcerated or detained, the prisoner has brought a federal action or appeal that was dismissed on the grounds that it was frivolous, malicious or fails to state a claim, unless the prisoner "is under imminent danger of serious

physical injury." We held in Gibbs that "imminent danger" is measured at the time of the alleged incident, not at the time the complaint is filed. 116 F.3d at 86. Three of our sister courts of appeals have since rejected our teachings in Gibbs, holding instead that the court should assess "imminent danger" as of the time the prisoner's complaint is filed and that a prisoner's allegation that he faced danger in the past is insufficient to allow him to proceed I.F.P. Medberry v. Butler, 185 F.3d 1189, 1193 (11th Cir.1999); Ashley v. Dilworth, 147 F.3d 715, 717 (8th Cir.1998); Banos v. O'Guin, 144 F.3d 883, 884-885 (5th Cir.1998). We now abandon the interpretation set forth in Gibbs and adopt that of our sister courts of appeals. We hold also that S 1915(g), as so interpreted, is constitutional.

I.

Appellant Debro Siddiq Abdul-Akbar was most recently incarcerated by the Delaware Department of Corrections from June 10, 1994 through May 15, 1999 on state charges including robbery, conspiracy, assault and shoplifting. During the time material to Appellant's underlying proposed Complaint based on 42 U.S.C. S 1983, he was incarcerated at the Sussex Correctional Institute in Georgetown, Delaware. On May 17, 1999, Appellant reported to a community confinement center, and on May 27, 1999, he was released from the custody of the Department of Corrections.

Appellant has filed at least 180 civil rights or habeas corpus claims. Abdul-Akbar v. Dept. of Corrections, 910 F.Supp. 986, 998 (D.Del.1995). In Abdul-Akbar v. Watson, 901 F.2d 329 (3d Cir.1990), this court reviewed a district court order barring Appellant from filing any further S 1983 claims I.F.P. and held that a district court may enter an injunction precluding a prisoner from filing any S1983 claims without leave of court and without making certain good faith certifications. 901 F.2d at 333. We stated that Abdul-Akbar's "history of repetitious and frivolous filings indicates a clear intent to abuse the courts and the I.F.P. process." Id. at 334. An injunction subsequently was entered by the district court. Abdul-Akbar v. Dept. of Corrections, 910 F.Supp. at 1009.

On February 10, 1998, Appellant filed a motion for leave to file a S 1983 Complaint, a proposed Complaint and a motion to proceed I.F.P. The proposed Complaint alleged that on or about January

9, 1998, prison officials arbitrarily sprayed Appellant with pepper gas and refused to provide him with medical treatment even though they knew that he suffers from asthma. Appellant also claimed that certain prison officials violated his civil rights by belonging to a racist organization, that one defendant failed to investigate properly the pepper spray incident, and that the district court judge violated his Sixth Amendment right of access to the courts by preventing his complaints from being heard.

**\*2** The district court denied the motion to proceed I.F.P., reasoning that (1) Appellant had brought actions that the court had dismissed as frivolous on more than three prior occasions, and (2) he did not claim to be in imminent danger of serious physical injury.

[1][2] The district court had jurisdiction over this case under 28 U.S.C. S 1331. We have jurisdiction because an order denying leave to proceed I.F.P. is a final, collateral order appealable under 28 U.S.C. S 1291. The appeal was timely filed. This court reviews de novo issues of statutory interpretation, Pennsylvania Mines Corp. v. Holland, 197 F.3d 114, 119 n. 2 (3d Cir.1999), and the constitutionality of a statute, DeSousa v. Reno, 190 F.3d 175, 180 (3d Cir.1999).

II.

The discretionary power to permit indigent plaintiffs to proceed without first paying a filing fee was initially codified in the federal statutes in 1892. See Act of July 20, 1892, ch. 209 1-5, 27 Stat. 252. Congress enacted the I.F.P. statute, currently codified at 28 U.S.C.S 1915, "to ensure that administrative court costs and filing fees, both of which must be paid by everyone else who files a lawsuit, would not prevent indigent persons from pursuing meaningful litigation." Deutsch v. United States, 67 F.3d 1080, 1084 (3d Cir.1995) (citing Denton v. Hernandez, 504 U.S. 25, 31, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992)). Congress was also aware of the potential for abuse, and it included a subsection allowing for dismissal of frivolous or malicious actions. Denton, 504 U.S. at 31.

Congress subsequently enacted the Prison Litigation Reform Act ("PLRA" or "Act"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), largely in response to concerns about the heavy volume of frivolous

prisoner litigation in the federal courts. See 141 Cong. Rec. S14408-01, S14413 (daily ed. Sept. 27, 1995) (statement of Sen. Dole) (explaining that the number of prisoner suits filed "has grown astronomically--from 6,600 in 1975 to more than 39,000 in 1994"). In enacting the PLRA, Congress concluded that the large number of meritless prisoner claims was caused by the fact that prisoners easily obtained I.F.P. status and hence were not subject to the same economic disincentives to filing meritless cases that face other civil litigants. See 141 Cong. Rec. S7498- 01, S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl) ("Filing frivolous civil rights lawsuits has become a recreational activity for long-term residents of prisons."); 141 Cong. Rec. S7498-01, S7524 (daily ed. May 25, 1995) (statement of Sen. Dole) ("[P]risoners will now 'litigate at the drop of a hat,' simply because they have little to lose and everything to gain."). To curb this trend, the PLRA instituted a number of reforms in the handling of prisoner litigation.

Among other things, the PLRA amended the I.F .P. statute as it applies to prisoners. Under the statute as amended, a prisoner who is allowed to proceed I.F.P. is not excused from paying filing fees, but is only excused from pre- paying them in full if they meet certain criteria. The PLRA now requires prisoners who qualify for I .F .P. status to pay by way of an initial partial fee, followed by installment payments until the entire fee is paid. 28 U.S.C. S 1915(b)(1). Congress also added S 1915(g), the "three strikes rule," which limits a prisoner's ability to proceed I.F.P. if the prisoner abuses the judicial system by filing frivolous actions. Prisoners may avoid the limitation in this provision, however, if they are under "imminent danger of serious physical injury."

**\*3** This appeal requires us to decide when the existence of "imminent danger" is to be assessed; specifically, whether it is assessed as of the time the complaint is filed, or at some time in the past, even though that danger no longer exists when the complaint is filed.

[3] Today we abandon the rule announced in Gibbs that "imminent danger" is assessed at the time of the alleged incident. We adopt, instead, the construction set forth by the Fifth, Eighth and Eleventh Circuit Courts of Appeals, that a prisoner may invoke the "imminent danger" exception only to seek relief from a danger which is "imminent" at the time the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

complaint is filed. We conclude that this interpretation is consistent with the plain language of S 1915(g), with congressional intent and with the legislative purpose of the PLRA as a whole.

## III.

This is a case of statutory construction, and we begin our analysis with the language of S 1915(g):

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

### A.

We now apply settled precepts of statutory construction and take as our beginning point a recognition that from the earliest times, we have adopted what is called the American Plain Meaning Rule exemplified in Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (internal citations omitted):

> It is elementary that the meaning of the statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms. Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion.

[4][5] In 1993, the Court made a modern statement of the plain meaning rule: "Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." Negonsett v. Samuels, 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993). If the language of the statute is plain, the sole function of the court is to enforce it according to its terms. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The plain meaning is. conclusive, therefore, "except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " Id. at 242 (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)).

### B.

*4 We now apply the ordinary meaning of the words chosen by Congress in drafting S 1915(g). The phrase "in no event" simply means "may not." This court has previously held that the word "bring" in this context plainly refers to the time when the civil action is initiated. Gibbs v. Ryan, 160 F.3d 160, 162 (3d Cir.1998). Putting the phrases together, the first clause of S 1915(g) obviously means "a prisoner may not file a new civil complaint." In the ordinary sense of the words, this clause refers temporally to the time the new complaint is filed. The clause "unless he is in imminent danger of serious physical injury" is an exception to the preclusive effect of the statute. But the exception is cast in the present tense, not in the past tense, and the word "is" in the exception refers back to the same point in time as the first clause, i.e., the time of filing. The statute contemplates that the "imminent danger" will exist contemporaneously with the bringing of the action. Someone whose danger has passed cannot reasonably be described as someone who "is" in danger, nor can that past danger reasonably be described as "imminent." The court so held in Ashley v. Dilworth, 147 F.3d 715, 717 (8th Cir.1998):

> As the statute's use of the present tense verbs 'bring' and 'is' demonstrates, an otherwise ineligible prisoner is only eligible to proceed IFP if he is in imminent danger at the time of filing. Allegations that the prisoner has faced imminent danger in the past are insufficient to trigger this exception to S 1915(g) and authorize the prisoner to pay the filing fee on the installment plan.

See also Medberry v. Butler, 185 F.3d 1189, 1193 (11th Cir.1999) ( "Congress' use of the present tense in S 1915(g) confirms that a prisoner's allegation that he faced imminent danger sometime in the past is an insufficient basis to allow him to proceed in forma pauperis...."); Banos v. O'Guin, 144 F.3d 883, 885 (5th Cir.1998) ("[T]he language of S 1915(g), by using the present tense, clearly refers to the time when the action or appeal is filed or the motion for IFP status is made."). Taking both clauses together, the statute plainly means that a prisoner is not permitted to file his complaint unless he is, at that time, under imminent danger. Viewed

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

from the Plain Meaning Rule, we interpret "is under imminent danger" to relate to the time when "a prisoner bring[s] a civil action."

IV.

Reinforcing the interpretation of the statute by application of the Plain Meaning Rule is an analysis of language found in other portions of the PLRA. For example, another section of the Act, S 1915(b)(4), provides:

In no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee.

28 U.S.C. S 1915(b)(4) (emphasis added). As in subsection (g), this provision begins with the exhortation "in no event shall," and, as in subsection (g), it describes a necessary condition by using the present tense of the operative verb. Section 1915(b)(4) plainly means that the courts may not prohibit a prisoner from filing a new complaint for the reason that he does not possess any assets at the time of filing. The temporal reference point for the verb "has" is the time of filing, the time at which the fee is due.

*5   [6][7][8]   Other provisions support this construction by focusing on the time of filing. Section 1997e(a) of Title 42, amended by the PLRA, requires that the plaintiff exhaust administrative remedies, but only if the plaintiff is a prisoner at the time of filing. Greig v. Goord, 169 F.3d 165, 167 (2d Cir.1999). Similarly, the applicability of the personal injury requirement of 42 U.S.C.S 1997e(e) turns on the plaintiff's status as a prisoner, not at the time of the incident, but when the lawsuit is filed. Harris v. Garner, 216 F.3d 970, 974-975 (11th Cir.2000). Finally, the need for the district court to screen a complaint in a civil action filed by a prisoner, as required by 28 U.S.C. S 1915A, looks to the plaintiff's status when the case is filed. Johnson v. Hill, 965 F.Supp. 1487, 1488 n. 2 (E.D.Va.1997).

V.

Appellant argues that requiring proof of imminent danger as of the time of filing is inconsistent with Congress' intent. Having applied the American Plain Meaning Rule and having determined that there is no ambiguity, we are not required to answer this

contention of the Appellant. Nevertheless, we perceive the congressional intent as clear when we examine the purpose of the entire PLRA.

[9] As noted above, Congress enacted the PLRA in order to limit the filing of frivolous and vexatious prisoner lawsuits. To accomplish this, Congress curtailed the ability of prisoners to take advantage of the privilege of filing I.F.P. The "three strikes" rule added by the PLRA supplied a powerful economic incentive not to file frivolous lawsuits or appeals. In stark terms, it declared that the I.F.P. privilege will not be available to prisoners who have, on three occasions, abused the system by filing frivolous or malicious lawsuits or appeals, no matter how meritorious subsequent claims may be.

[10] It is important to note that S 1915(g) does not block a prisoner's access to the federal courts. It only denies the prisoner the privilege of filing before he has acquired the necessary filing fee. Appellant argues that a prisoner subject to the "three strikes" rule, but who does not establish "imminent danger," could for ever lose his ability to bring his suit as a practical matter because of the difficulties of obtaining the money, the application of the statute of limitations, or the possible loss of necessary evidence. This argument attempts to prove too much. It overlooks the fact that prisoners may seek relief in state court, where limitations on filing I.F.P. may not be as strict. Potentially negative consequences in federal courts, as distinguished from state courts, are precisely the consequences intended by Congress. The outcome predicted by Appellant is, for better or for worse, exactly the result the PLRA intends.

Recognizing that it could take prisoners a significant period of time to obtain the filing fee in some cases, Congress created a limited exception aimed at preventing future harms, and did so through the use of the word "imminent." "Imminent" dangers are those dangers which are about to occur at any moment or are impending. See WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 611 (1984). By using the term "imminent," Congress indicated that it wanted to include a safety valve for the "three strikes" rule to prevent impending harms, not those harms that had already occurred. The imminent danger exception allows the district court to permit an otherwise barred prisoner to file a complaint I.F.P. if the prisoner could be subject to serious physical injury and does not then

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

have the requisite filing fee.

**\*6** In contrast, under the Gibbs construction, the prisoner need only show that he was subject to imminent danger at the time of the alleged incident. By definition, an imminent threat of serious physical injury always exists in the moments before any such injury is inflicted. Thus, under the Gibbs approach, any time that an otherwise disqualified prisoner alleges that any threat of physical injury occurred at any time, that prisoner automatically qualifies for the imminent danger exception. The Gibbs interpretation of the imminent danger exception thereby swallows the rule. Like every other court of appeals that has considered this issue, we refuse to conclude that with one hand Congress intended to enact a statutory rule that would reduce the huge volume of prisoner litigation, but, with the other hand, it engrafted an open-ended exception that would eviscerate the rule. [FN1]

[11][12] This is not to suggest that we would criticize any statute or judicially-created legal precept that would permit any prisoner, even a frequent filer, to file such a complaint I.F.P. Such a notion is entirely compatible with the precept that for any injury, there should be a remedy. But we do not write in the abstract here, nor do we write on a clean slate. Congress has deliberately decided to legislate on this subject by proclaiming, as public policy, a determination to reduce prisoner litigation in the federal courts. As citizens, we may disagree with the congressional wisdom, but as judges, knowing the clearly stated legislative purpose, we may not disembowel the legislative act. Federal courts, unlike state common law King's Bench courts, do not have unlimited power and authority. We are limited to that which has been granted by Congress. What Congress gives it may also take away. The ability to proceed I.F.P. is not a constitutional right. Congress granted the right to proceed I.F.P. in 1892, and it has the power to limit this statutorily created right. Here it has taken away our ability as judges to grant I.F.P. status to a "three strikes" prisoner, no matter how meritorious his or her subsequent claims may be, unless the prisoner "is under imminent danger of serious physical injury" when he or she "bring[s] a civil action." Congress has held trump here, and it has dealt a hand. As judges we must play it.

VI.

[13] Appellant also mounts the argument that S 1915(g), as we interpret it, would offend the equal protection guarantee implied in the Fifth Amendment by improperly burdening a prisoner's "fundamental right of access" to the courts. [FN2]

Moreover, he argues that we must apply strict scrutiny in considering this contention and that, alternatively, even under rational basis scrutiny, the statute, as we interpret it, does not pass constitutional muster because it is not rationally related to a legitimate governmental interest.

A.

[14][15][16][17] Although the Fifth Amendment contains no Equal Protection Clause, "the Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.' " Schlesinger v. Ballard, 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (quoting Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). Accordingly, the Court has construed the Fifth Amendment to contain an equal protection guarantee. See, e.g., Edmonson v. Leesville Concrete Co., 500 U.S. 614, 616, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Fifth Amendment equal protection claims are examined under the same principles that apply to such claims under the Fourteenth Amendment. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 217, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (citations omitted). Statutes that substantially burden a fundamental right or target a suspect class must be reviewed under "strict scrutiny;" that is, to survive, they must be narrowly tailored to serve a compelling governmental interest. Plyler v. Doe, 457 U.S. 202, 216-217, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Conversely, if a statute neither burdens a fundamental right nor targets a suspect class, it does not violate the Fourteenth Amendment's Equal Protection Clause, as incorporated through the Fifth Amendment's Due Process Clause, so long as it bears a rational relationship to some legitimate end. Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

**\*7** [18] This requires us first to determine whether Appellant is a member of a suspect class or whether a fundamental right is implicated. Neither prisoners nor indigents are suspect classes. See, e.g., Pryor v.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Brennan, 914 F.2d 921, 923 (7th Cir.1990) (noting that prisoners do not constitute a suspect class); Harris v. McRae, 448 U .S 297, 323 (1980) (noting that poverty is not a suspect classification). Nor has Appellant argued before us that indigent prisoners, specifically, frequent filer indigent prisoners, are a suspect class. We then must inquire whether the "time of filing" construction infringes upon one of Appellant's fundamental rights.

B.

[19][20][21] Appellant contends that the "time of filing" interpretation adopted by our sister courts of appeals and adopted by us today unconstitutionally burdens his fundamental right of access to the courts by requiring him to pay fees. But the right of access to the courts is not absolute. United States v. Kras, 409 U.S. 434, 450, 93 S.Ct. 631, 34 L.Ed.2d 626 (1972). Courts presented with this issue have consistently held that merely requiring a prisoner to pay filing fees in a civil case does not, standing alone, violate that prisoner's right of meaningful access to the courts. See, e.g., Rivera v. Allin, 144 F.3d 719, 724 (11th Cir.1998); Roller v. Gunn, 107 F.3d 227, 231 (4th Cir.1997). We agree. Section 1915(g) does not prevent a prisoner with "three strikes" from filing a civil action; he or she is simply unable to enjoy the benefits of proceeding I.F.P. and must pay the fees at the time of filing instead of under the installment plan. And, given the right of Congress to limit the power of federal courts, it cannot be said that limiting the temporal aspect of the exception to the "three strikes" rule infringes upon Appellant's right of access to the courts.

[22] The Court has recognized only a "narrow category of civil cases in which the State must provide access to its judicial processes without regard to a party's ability to pay court fees." M.L.B. v. S.L.J., 519 U.S. 102, 113, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). An unconditional right of access exists for civil cases only when denial of a judicial forum would implicate a fundamental human interest--such as the termination of parental rights or the ability to obtain a divorce. Id. at 116-117; Boddie v. Connecticut, 401 U.S. 371, 382-383, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). Examples of interests that the Court has held do not rise to this level are bankruptcy filings, Kras, 409 U.S. at 444-445, and welfare benefit determinations, Ortwein v. Schwab, 410 U.S. 656, 659, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973).

[23][24] In the seminal case of Boddie, the Court emphasized that the deprivation of due process emanated from "the State's refusal to admit these appellants to its courts, the sole means in Connecticut for obtaining a divorce, [and that this] must be regarded as the equivalent of denying them an opportunity to be heard upon their claimed right to a dissolution of their marriages." 401 U.S. at 380-381 (emphasis added). Unlike the parties in Boddie, Appellant is not precluded from filing his S 1983 Complaint in another court system that does not have a "three strikes" provision. State courts have concurrent jurisdiction over S 1983 cases. Howlett v. Rose, 496 U.S. 356, 358, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). Appellant can seek I.F.P. status under Delaware law because it does not have a parallel "three strikes" rule. See generally 10 Del. C. S 8802 (I.F.P.statute). A state court provides a fully adequate forum for the vindication of civil rights claims. See generally Tafflin v. Levitt, 493 U.S. 455, 458, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) ("[S]tate courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States."). Because neither Delaware substantive law nor Delaware court rules prevented him, as an indigent prison litigant, from pursuing his claims, we do not agree that strict scrutiny is the appropriate test. We therefore examine S 1915(g) using rational basis review as have our sister courts of appeals. See, e.g., Rodriguez v. Cook, 169 F.3d 1176, 1180 (9th Cir.1999); White v. Colorado, 157 F.3d 1226, 1234 (10th Cir.1998), cert. denied, 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 216 (1999); Wilson v. Yaklich, 148 F.3d 596, 604 (6th Cir.1998), cert. denied, 525 U.S. 1139, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999); Rivera, 144 F.3d at 727; Carson v. Johnson, 112 F.3d 818, 822 (5th Cir.1997).

C.

*8 [25] We are satisfied that our interpretation of S 1915(g) passes the rational basis test. Appellant focuses on the right of access to the courts, arguing that S 1915(g)'s purpose and effect is to prevent him and other frequent filer prisoner indigents from filing civil lawsuits. In addressing this contention, we must first examine the legislative purpose.

As discussed above, the legislation was aimed at the skyrocketing numbers of claims filed by prisoners--

many of which are emotionally driven but legally deficient--and the corresponding burden those filings have placed on the federal courts. Congress sought to put in place economic incentives that would prompt prisoners to "stop and think" before filing a complaint. [FN3] The "three strikes" rule thus serves as a rational deterrent mechanism, forcing potential prisoner litigants to examine whether their filings have any merit before they are filed, and disqualifying frequent filers who have failed in the past to carefully evaluate their claims prior to filing.

[26][27] Deterring frivolous prisoner filings in the federal courts falls within the realm of Congress' legitimate interests, and the interpretation we adopt today is rationally related to the achievement of that interest. "[T]he right of access to federal courts is not a free floating right, but rather is subject to Congress' Article III power to set limits on federal legislation." Roller, 107 F.3d at 231. Although it had the power to do so, Congress did not repeal any particular cause-of-action available to prisoners. Rather, Congress changed only the rules regarding I.F .P. status. Under S 1915(g), prisoners are still able to file civil actions; they are merely prohibited from enjoying I.F.P. status. Lyon v. Krol, 127 F.3d 763, 765 (8th Cir.1997); Carson, 112 F.3d at 821. Preventing frequent filers from obtaining fee waivers is rationally related to the legitimate government interest of deterring frivolous lawsuits because "Congress is no more compelled to guarantee free access to federal courts than it is to provide unlimited access to them." Roller, 107 F.3d at 231. Although the dissent claims that the "three strikes" rule embodied in S 1915(g) is too blunt an instrument and is insufficiently targeted to arrest frivolous filings, we have always recognized that constitutional constraints "require[ ] neither a perfect nor even best available fit" between a statute's goal and the means employed in that statute to further that goal. United States v. Mariani, 212 F.3d 761, 774 (3d Cir.2000) (en banc).

Congress included an exception to the "three strikes" rule for those cases in which it appears that judicial action is needed as soon as possible to prevent serious physical injuries from occurring in the meantime. Thus, S 1915(g) rationally balances the economic deterrence rationale behind the "three strikes" rule with the need for those prisoners who remain in danger of future grievous harm to be able to file immediately. Accordingly, we hold that our interpretation of S 1915(g) does not violate equal protection concepts embodied in the Fifth Amendment.

*9 * * * * *
We have considered all contentions presented by the parties and conclude that no further discussion is necessary.

The judgment of the district court will be affirmed. [FN4]

MANSMANN, Circuit Judge, dissenting, with whom Judges Sloviter, Nygaard and McKee join.

I.

Today the majority interprets and applies the "three strikes" rule of the Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. S 1915(g), in a manner destined to bar the doors of our courts against a disfavored group-- indigent prisoners who have resorted unsuccessfully to civil litigation--even with respect to meritorious litigation that may be their sole means of vindicating a fundamental right. Because I believe that this case falls within a statutory exception, as properly interpreted in Gibbs, [FN1] and that the statute, as interpreted and applied by the majority, substantially burdens fundamental rights without narrowly serving a compelling governmental interest, I respectfully dissent.

In 1990 we struck down a District Court injunction barring in forma pauperis ("IFP") suits by the same Appellant before us today as violative of the constitutional right of access to the courts, and we directed instead entry of an injunction that would permit such suits subject to certification and review calculated to test for frivolity. See Abdul-Akbar v. Watson, 901 F.2d 329 (3d Cir.1990). While not expressly repudiating our holding in Watson, the majority nonetheless essentially holds that what the District Court was then precluded from doing by the Constitution it is now required to do by statute. Today's holding therefore places us at odds with a well-established line of cases exemplified by Watson. [FN2]

This case unfortunately illustrates the maxim that bad cases may sometimes make bad law. This Appellant has clearly abused the IFP system, filing some 200 cases, most without merit. The three strikes rule as interpreted by the majority, however, will burden other would-be litigants who have not

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

filed 200 cases, and whose "strikes" were racked up without any bad faith or abuse. [FN3] It will, moreover, bar potentially meritorious litigation at the filing stage, with no opportunity for substantive review or appeal.

II.

The principal holding announced by the majority is not very far-reaching. It rejects a statement in our earlier Gibbs case to the effect that imminent danger is to be determined as of the time of the incident complained of, and joins with our sister courts of appeals that have held that danger must exist at the time the Complaint or appeal is filed. I joined in, and continue to adhere to, the able opinion of Judge Garth in Gibbs. In Gibbs we held that a prisoner who alleged two prior attacks by inmates and death threats, each related to his identification as a government informant, and who alleged that his "life[was] in constant danger", provided sufficient allegations of "imminent danger" to survive the "three strikes" rule. Although our principal holding was that "a complaint alleging imminent danger ... must be credited as having satisfied the threshold criterion of S 1915(g) unless[that] element is challenged", we also stated that "the proper focus when examining an inmate's complaint filed pursuant to S 1915(g) must be the imminent danger faced by the inmate at the time of the alleged incident, and not at the time the complaint was filed." 116 F.3d at 86.

*10 No clear intent may be discerned from section 1915(g)'s use of the present tense ("unless the prisoner is under imminent danger"), because the same subsection elsewhere employs the present tense in reference to what are expressly recognized as past events ("if the prisoner has brought an action or appeal ... that was dismissed on the grounds that it is frivolous, malicious or fails to state a claim ..."). This erroneous combination of tenses renders the statutory provision ambiguous, and I believe that such ambiguity must be resolved in favor of preserving the right of access to the courts for prisoners threatened with bodily injury.

As the majority has acknowledged, the purpose of the exception is to "prevent [ ] future harms." Supra at 11. This purpose is best served by a liberal interpretation of the exception, one which gives scope to--and so facilitates-- the deterrent effect of the subsequent damages remedy available under section 1983. See City of Riverside v. Rivera, 477 U.S. 561, 575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (plurality) (stating that "the damages a plaintiff recovers contribute significantly to the deterrence of civil rights violations in the future"). Cf. Gibbs (rejecting argument that "suit for damages rather than injunctive relief ... was not seeking to protect ... physical safety"). 116 F.3d at 85. Contrary to the majority's assertion, the exception as interpreted by Gibbs does not "eviscerate" the three strikes rule. A would-be litigant must plead imminent danger of serious physical injury (rather than a deprivation of procedural, associational, religious or other rights), and the court must determine that such danger is or was in fact present if such allegation is controverted. Moreover, as discussed below, section 1915(g)'s potential encroachment into important 665<!>constitutional rights also counsels for a broad interpretation of the exception. Finally, the importance of presenting an appropriately lenient interpretation in this en banc opinion--which will guide the district courts in their decisions on hundreds, if not thousands, of prisoner filings--is heightened by the preclusive nature of section 1915(g). That is, the denial of in forma pauperis status and resultant dismissal of prisoner litigation made pursuant thereto will be effectively unreviewable, as a truly indigent plaintiff will no more be able to afford the requisite filing costs for appeal of that dismissal than for the underlying action.

III.

While I disagree with the majority's rejection of the standard enunciated in Gibbs for one which determines the existence of imminent danger at the time the Complaint or appeal is filed, it is the majority's application of that standard to the facts of this case, and implicitly to those of Gibbs, that I find considerably more troubling.

The majority appears simply to assume that its holding that imminent danger must be assessed at the time of filing is dispositive of this case, and that Appellant was not in such danger. In so assuming, the majority seriously undermines protection of physically endangered prisoners by paying too little heed to ongoing threats.

*11 The majority's lengthy explication of statutory tense notwithstanding, an equally crucial question of interpretation under section 1915(g) concerns the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

meaning of "imminent danger". The majority's definition of "imminent" dangers as those "which are about to occur at any moment or impending", supra at 11, is far too restrictive. In a real-world prison setting, the timing of an attack cannot be so neatly predicted. It may be that an ongoing threat of danger looms over a prisoner for an extended period. At any given moment, the harm might not be "about to" occur; then again, it might. Such is the nature of "danger". It involves risk, not certainty.

The phrase "imminent danger" is not defined in the PLRA. It may be instructive, however, to consider the definition accorded the same phrase in other contexts. For example, under the Eighth Amendment prison authorities must protect prisoners not only from current threats, but also from "sufficiently imminent dangers"; and the courts have defined that phrase as encompassing those dangers "likely to cause harm in the 'next week, month, or year.' " Horton v. Cockrell, 70 F.3d 397, 401 (5th Cir.1995) (quoting Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); Payne v. Collins, 986 F.Supp. 1036, 1052 (E.D.Tex.1997) (observing that this approach includes review of the actions taken to alleviate the threat). [FN4] In discussing "imminent harm" in the preliminary injunction context, we have held that standard met where the potential harm was not "uncertain or speculative", but might be expected to occur before the threat could otherwise be averted. [FN5] In determining standing, the courts have framed their inquiry into the "immediate threat" as one encompassing consideration of the likelihood of an ongoing danger, as evidenced by past events. See, e.g., O'Shea v. Littleton, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury").

Indeed, this conception of imminent danger as encompassing an ongoing threat has been explicitly recognized by one of our sister circuits. In Ashley v. Dilworth, 147 F.3d 715 (8th Cir.1998), the Eighth Circuit held that a prisoner placed in continuing proximity to inmates on his "enemy alert list" and subject to prior assaults "properly alleged an ongoing danger" and so "[met] the imminent danger exception of section 1915(g)." 147 F.3d at 717. [FN6]

Appellant's litigious history may incline us to read his Complaint with a certain degree of skepticism.

Nonetheless, our precedents require us to construe pleadings, and especially pro se pleadings, liberally. See Gibbs, 116 F.3d at 86 (observing that "[u]nder our liberal pleading rules" all allegations should be construed "in favor of the complainant") (citations omitted). Reading the Complaint in the light most favorable to Appellant, I find his claimed predicament alarming.

Appellant, a black inmate, brought this action seeking, inter alia, an injunction against white prison guards "from continuing ... plots to hurt or kill [him]". App. 8. The guards in question are asserted to be racists who "don't accept ... Black people as human beings" and thus do not respect rights of any black person. App. 13. Appellant is a particular target of the guards' animus, as he asserts they are engaged in a conspiracy to retaliate against Appellant for filing complaints against them for past abuses.App. 9.

*12 Guards have made a practice of using pepper gas routinely to punish inmates for failing to obey orders or for "saying something an officer don't like." App. 10. "[M]ajor problems happen on the white [guards'] shifts, especially Black inmate's [sic] getting sprayed arbitrarily with pepper gas." App. 13. Although Appellant complained for over a year about the abuse of pepper gas, no restraint was placed on the use of pepper gas. App. 10, 11.

Defendants "know [Appellant has] asthma ... and they've seen [him] suffer whenever that pepper gas has been sprayed." App. 12. The danger faced by Appellant was not limited to attacks directed against him. Rather, the use of pepper gas "effects [sic] every inmate ... in the area". For example, in December, 1997, Appellant was exposed to pepper gas directed at other inmates and was taken to the hospital with an asthma attack. App. 10-11.

In September or October of 1997, in a "deliberate attempt to have [Appellant] hurt or killed", a guard told an inmate that Appellant had "snitched" on him and other inmates. App. 12. Although Appellant feared for his life as a result of this incident, his request for protective custody was not honored. App. 12.

On January 8, 1998 Appellant was transferred to a cell block with no window "for the express purpose's [sic] of having [him] in an area where the[racist guards] could harass, set up and try to kill

[him]". The very next day, one of the defendant guards, again in the presence of other inmates, accused Appellant of informing, and proceeded to spray him with an entire can of pepper gas, whereupon Appellant collapsed with an asthma attack, "fighting for breath on the floor" and the guard "left [him] on the floor to die."

As far as the record reflects, none of the foregoing conditions had been corrected at the time Appellant filed his Complaint. [FN7]

In sum, Appellant alleges that at the time of the Complaint (i) Appellant remained confined in an institution controlled by guards who believed he did not have any rights and who had a vendetta against him; (ii) the guards made a practice of spraying inmates with pepper gas (to which Appellant was acutely vulnerable) on slight provocation, and prison officials placed no restraint on that practice; (iii) Appellant had been injured twice by pepper gas within just the past 10 weeks prior to filing; [FN8] (iv) the guards had incited hostility toward Appellant on the part of other prisoners by labeling Appellant as an informant; [FN9] and (v) Appellant was housed in a cell block selected to facilitate attacks by guards and inmates. These unabated conditions clearly give rise to an ongoing imminent danger.

Hence, I believe the facts alleged in this case place Appellant squarely within a proper interpretation of the exception to the three strikes rule. In Gibbs, as in Ashley and Choyce, there were similarly sufficient averments of ongoing danger that remained "imminent" at the time of filing. [FN10] The majority today disposes of this case, overrules Gibbs, and effectively disagrees with Ashley and Choyce, without carefully analyzing the sufficiency of the allegations of ongoing danger. [FN11]

*13 The result is that, henceforth in this Circuit, prisoners with three strikes seeking IFP status will be faced with an insurmountable obstacle: they must show that a serious physical injury is "about to" befall them "at any moment", and apparently they may not predicate their showing on an ongoing risk based on past events. [FN12] What, then, will suffice? Must a prisoner be running from his attackers as he files? By limiting the imminent danger exception to the "sword of Damocles" situation, the majority all but writes the exception out of the statute. Certainly, the drastically impoverished version of the exception allowed by the majority cannot well fulfill its putative office as "a safety valve ... to prevent impending harms". Supra at 11 [FN13]

A prisoner's resort to the courts may be expected to avert impending danger not only by correcting unlawful conditions, [FN14] but by deterring prison officials from unlawful conduct. Under the majority's interpretation, the potential deterrence of civil rights damages would be lost with respect to indigent prisoners with a history of prior failed suits. That is, guards would be free to abuse or retaliate against such prisoners without fear of civil liability, so long as their conduct was not so perpetual as to trigger the majority's test for imminent danger.

The majority's undermining of the protections afforded civil rights under section 1983 is exacerbated by other factors which, by delaying access to courts, increase the likelihood that past abuses will effectively be immunized because a danger will no longer be "imminent" at the time of filing. [FN15]

Finally, even in the rare case that satisfies the majority's narrow definition of imminent danger at the time of filing, a prisoner is effectively denied protection against trial error. Under the majority's interpretation, a prisoner who has secured a final judgment in the District Court finds himself in a peculiar position: he must once again meet the "imminent danger" requirement at that moment in time in order to file an appeal IFP. It is highly improbable that the danger would still be "about to" occur at the time of an appeal, following entry of judgment.

Although the majority opinion purports to create unanimity among the courts of appeals, it does not and cannot achieve that purpose. As discussed above, today's holding cannot be reconciled with either the Eighth Circuit's decision in Ashley or the Fifth Circuit's decision in Choyce. Those cases evaluated the danger as of the filing date, but both recognized that the imminent danger requirement may be satisfied by an ongoing threat evidenced by past injuries attributable to uncorrected conditions. See supra n. 6 and accompanying text. [FN16] We cannot avoid a conflict by reciting similar standards, while reaching inconsistent results.

I would hold that the exception applies, in accord with Gibbs, Ashley and Choyce; and I would leave

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

for another day determination of the constitutional validity of section 1915(g) in a case that clearly falls outside of its saving exception. [FN17] However, since the majority has interpreted the exception narrowly and has found this case within the rule barring IFP status, I will proceed to address the statute's constitutionality.

IV.

**\*14** As the majority acknowledges, "[s]tatutes that substantially burden a fundamental right ... must be narrowly tailored to serve a compelling governmental interest. Plyler v. Doe, 457 U.S. 202, 216-17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)." Supra at 14. [FN18] The right of access to the courts has long been deemed fundamental. As long ago as 1215, this right was articulated in Chapter 29 of the Magna Carta. [FN19] In the seminal case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803) the Supreme Court observed that"[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." More recently, the Court has repeatedly recognized the fundamental importance of the right of access to courts. [FN20]

In Wolff, supra, the Supreme Court held that prisoners have a constitutional right to bring civil rights actions before the courts. "The right of access to the courts ... is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." Wolff, 418 U.S. at 579. [FN21]

By 1977, the Supreme Court found it to be "beyond doubt that prisoners have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). [FN22] The Court in Bounds described this right of access as "fundamental", and held that it requires that prisoners receive "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Bounds, 430 U.S. at 825, 828. Finally, in Lewis, the Court indicated that inmates' right of court access recognized in Bounds applies to actions "to challenge the conditions of their confinement". Lewis, 518 U.S. at 355.

As we have previously held, this right of court access applies even to litigious prisoners such as Appellant. See In re Oliver, 682 F.2d 443, 446 (3d Cir.1982), quoted in Walton, 901 F.3d at 332 ("Access to the courts is a fundamental tenet to our judicial system; legitimate claims should receive a full and fair hearing no matter how litigious the plaintiff may be.").

In view of this long and virtually unbroken array of authority, [FN23] it can scarcely be disputed that prisoners' right of access to the courts is a fundamental right. The majority is doubtless correct in pointing out that the right of access is "not absolute"; no rights are. What is important for equal protection purposes is that the right of access is fundamental, at least when underlying fundamental rights are involved. See McCarthy v. Madigan, 503 U.S. 140, 153, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("[T]he right to file a court action might be said to be [a prisoner's] remaining 'most fundamental political right, because preservative of all rights.' ") (quoting Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). [FN24] Even if access to courts were not itself a fundamental right, denial of access should still be subject to strict scrutiny to the extent that it may impermissibly burden underlying fundamental rights at stake. [FN25]

**\*15** Indeed, the majority opinion acknowledges that "[a]n unconditional right of access exists for civil cases ... when denial of a judicial forum would implicate a fundamental human interest". Supra at 15. However, it declines to address whether Appellant's claims involve fundamental rights. [FN26]

Notwithstanding the majority's avoidance of the issue, it is manifest that the rights underlying Appellant's suit are fundamental. As I read the Complaint, at stake are the rights to be free from arbitrary infliction of serious physical injury, [FN27] and from racially discriminatory assault. [FN28] That these rights are fundamental to our constitutional system cannot be gainsaid. [FN29]

Moreover, other fundamental rights are sure to be implicated in cases barred by the three strikes rule. For example, a suit charging denial of a prisoner's religious freedom in violation of the First Amendment is not likely to involve an element of imminent danger, and so will fall outside of the exception under section 1915(g). See, e.g., Lyon v.

Krol, 940 F.Supp. 1433, 1437 (S.D.Iowa 1996), appeal dismissed, 127 F.3d 763 (8th Cir.1997) (dismissing prisoner's free exercise of religion claim pursuant to three strikes rule). Cf. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (recognizing prisoner's fundamental right to free exercise of religion). [FN30]

It seems clear that section 1915(g) substantially burdens affected prisoners' access to the courts and thereby burdens their enjoyment of whatever underlying rights they may seek to enforce in court. The statute's effect, in contravention of our law going back to the Magna Carta, is either to sell, to delay or to deny justice to the prisoners subject to its strictures. [FN31] If they cannot buy entry into court, they must wait until they can; and if the wait is too long, justice will be denied to them. [FN32]

In response to the apparent burden on fundamental rights, the majority makes two arguments: First, the majority argues that section 1915(g) does not prevent affected prisoners from filing their actions, but only from enjoying IFP status. The same argument was previously made by the Eleventh Circuit. See Rivera v. Allin, 144 F.3d 719, 723 (11th Cir.1998). This argument reflects a surprising disregard for the practical financial constraints faced by indigent prisoners, and appears to ignore the reality, recognized by the Supreme Court, that even a small prepayment obligation can pose an insurmountable hurdle. See Boddie, 401 U.S. at 380 (acknowledging that a facially valid fee may "offend due process because it operates to foreclose a particular party's opportunity to be heard."); Green, 669 F.2d at 786 (describing a prepayment requirement as a "potentially prohibitive financial barrier" to court access on the part of the affected indigent prisoner). The majority does not, however, really miss this point: in the very same paragraph in which it argues that section 1915(g) does not block access to the federal courts, it concludes that precluding suit in federal court as a practical matter is precisely what Congress intended. See supra at 10-11. [FN33]

*16 Because it ultimately recognizes the practical reality that access to the federal courts will be delayed or denied for some, the majority repairs to its second argument: that foreclosing the federal forum imposes no real burden, as prisoners may bring the same civil rights claims in state courts,

"where limitations on filing I.F.P. may not be as strict." Supra at 10 (emphasis added); see also supra at 15. In the end, the majority's rejection of strict scrutiny is expressly predicated on the presumed availability of a state law forum. [FN34] See supra at 16 ("Because neither Delaware substantive law nor Delaware court rules prevented [Appellant] ... from pursuing his claims, we do not agree that strict scrutiny is the appropriate test.") (emphasis added). [FN35] See also Wilson v. Yaklich, 148 F.3d 596, 605 (6th Cir.1998) (concluding that prisoner's fundamental right of access to the courts was not infringed upon because he "still had available ... the opportunity to litigate his federal constitutional causes of action in forma pauperis in state court."). But cf. Rivera, 144 F.3d at 724 n. 9 (declining to place reliance on availability of state forum).

Even assuming that a state forum is available, however, it is by no means clear that denial of a federal forum does not in itself impose a substantial burden on the right of access. See, e.g., Lyon, 940 F.Supp. at 1437-38 ("Although inmates can also bring S 1983 claims in state court, plaintiffs have an important interest in access to federal courts for vindication of their federal constitutional rights."); see also Procup, 792 F.2d at 1070 ("An absolute bar against a prisoner filing any suit in federal court would be patently unconstitutional."); Green, 669 F.2d at 786 (concluding that "constitutional right of access to the courts" was "unduly impair[ed]" by order that effectively denied "any and all access to the district court"); Packer Avenue Assocs., 884 F.2d at 748 (holding that order prohibiting subsequent filings in federal court could "not be allowed to stand"). [FN36]

Although the alternative forum argument may have superficial appeal, I do not believe it can withstand searching examination. In the first place, the argument neglects to consider foreclosure of the courts to the "three-strikes" prisoner in states which have adopted parallel legislation. [FN37] This is not merely an academic concern. The Commonwealth of Pennsylvania appeared as an amicus curiae in this case and explained that the "many thousands of prisoners" housed in Pennsylvania's thirty-nine correctional facilities "annually file hundreds of federal civil actions directed against state officials and employees", and implied that a substantial number of those actions would be affected by the decision announced herein. Because Pennsylvania has adopted a three strikes limitation of IFP status

that parallels section 1915(g), there is no judicial forum available to indigent Pennsylvania prisoners with three strikes unless they can satisfy the majority's virtually preclusive test for imminent danger, no matter how meritorious their claims and no matter how fundamental the rights at stake. [FN38]

**\*17** In the second place, the alternative forum argument also neglects the potential implications of removal to federal court. Federal-law civil rights actions filed in state court generally may be removed by the defendants, with the likely effect that an indigent plaintiff subject to the three strikes rule would lose his ability to appeal. [FN39] The prospective loss of such an important procedural safeguard is a very substantial burden on affected litigants. [FN40]

Because section 1915(g) does impose a substantial burden on the fundamental rights of many if not all members of the class against whom it is directed, the next step is to examine whether it is narrowly tailored to serve a compelling governmental interest.

As identified by the majority, the congressional purpose behind section 1915(g) was to deter frivolous lawsuits through "economic incentives that would prompt prisoners to 'stop and think' before filing a complaint." Supra at 17. See also supra at 10 ("The 'three strikes' rule ... supplied a powerful economic incentive not to file frivolous lawsuits or appeals."). [FN41] It is not at all apparent how "disqualifying frequent filers who have failed in the past to carefully evaluate their claims" can serve as a "deterrent mechanism". Supra at 17 (emphasis added). No matter how long a disqualified prisoner such as Appellant stops, no matter how carefully he thinks, and no matter how meritorious his claims, he will remain disqualified. It is simply not possible to deter frivolous filings that have already occurred. At a minimum, therefore, the retrospective application of the three strikes rule to past filings cannot further the statute's asserted deterrent purpose. [FN42]

With respect to future filings, it is difficult to see how the three strikes rule functions solely as an economic deterrent. To be sure, another section of the PLRA is well calculated to have that effect. See 28 U.S.C.S 1915(b) (requiring prisoners with IFP suits to pay filing fee in installments, in lieu of prior practice of waiving fee). This section corrects the perceived problem of inmates filing suits with no

financial consequences, while at the same time ensuring that the truly indigent prisoner will not be denied access to the courts solely because he lacks the requisite funds. [FN43] The disincentive supplied by the three strikes rule, on the other hand, is not purely economic. For the truly indigent, the rule threatens a loss of the fundamental right of access to the courts. This is in no sense a market-correcting economic deterrent. [FN44]

In any event, even assuming that the goal of deterring frivolous suits is a compelling governmental interest, and that the three strikes rule somehow furthers that goal, the statute nevertheless cannot withstand strict scrutiny because at best there is only a very poor fit between end and means. As a mechanism for deterring frivolous claims, section 1915(g) is both under- and over -inclusive. On the one hand, it leaves unchecked the flow of frivolous lawsuits filed by indigent non-prisoners and by prisoners and non-prisoners with sufficient funds. [FN45] On the other hand, it cuts off non-frivolous claims filed by indigent prisoners within its scope. See supra at 10 ("In stark terms, ... the I.F.P. privilege will not be available ... no matter how meritorious subsequent claims may be."). [FN46] These shortcomings precisely echo those of the prepayment requirements disapproved in Green and its progeny. [FN47] Cf. Rinaldi v. Yeager, 384 U.S. 305, 310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966) (state statute requiring reimbursement of cost of criminal appeal transcript only as to prisoners held unconstitutional: "Assuming a law enacted to [deter frivolous appeals] to be otherwise valid, the present statutory classification is no less vulnerable under the Equal Protection Clause when viewed in relation to that function. By imposing a financial obligation only upon inmates of institutions, the statute inevitably burdens many whose appeals, though unsuccessful, were not frivolous, and leaves untouched many whose appeals may have been frivolous indeed.") Moreover, much better targeted means are available to arrest chronic frivolous filings. [FN48]

**\*18** It is therefore not surprising that courts which have applied strict scrutiny have found section 1915(g) wanting. See Lyon, 940 F.Supp. 1433 (S 1983 action alleging denial of participation in Jewish services and other religious practices); [FN49] Ayers v. Norris, 43 F.Supp.2d 1039 (E.D.Ark.1999). See also Wilson, 148 F.3d at 604 (upholding section 1915(g) under a rational basis

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

test, but noting the court "might not believe [S 1915(g)] to be ... even a prudent[ ] response to the problem presented"). [FN50]

Because section 1915(g) is not narrowly tailored to serve a compelling governmental purpose, its substantial infringement of indigent prisoners' fundamental right of access to the courts, and of the constitutional rights at stake in the potential litigation thwarted thereby, amounts to an unconstitutional deprivation of the equal protection of the laws and of the due process of law guaranteed by the Fifth Amendment. [FN51] Cf. Romer v. Evans, 517 U.S. 633 (1996) ("A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense."). [FN52]

> FN1. The dissent devotes much effort to asserting that, even under our time of filing construction, Appellant's S 1983 Complaint satisfied the terms of the imminent danger exception because the Complaint, under the dissent's liberal construction, alleged an ongoing risk of serious physical injury. Importantly, at no point in the present litigation did Appellant seek to rely on an ongoing danger theory, even through the able counsel appointed by this court for purposes of this appeal. Inasmuch as the dissent uses our silence with respect to an issue not raised by the parties to argue that our construction of the imminent danger exception eliminates a prisoner's ability to satisfy the imminent danger exception by alleging an ongoing risk of serious physical injury, we respond only by stressing that we by no means intend such a result.
> At all events, we doubt whether the allegations in Appellant's S 1983 Complaint suffice to establish such an ongoing danger. Even under a liberal reading of Appellant's pleading, it is evident that Appellant's allegations center on an incident that occurred on or about January 9, 1998, when a prison official allegedly sprayed Appellant with pepper gas. App. 9-10. Appellant does not identify any further incidents occurring after that date. Moreover, although Appellant alleges that he experienced several other acts of physical harassment by different prison officials, these events not only all pre-date the January 9th incident, but also appear entirely unconnected to it, and thus undermine the dissent's claim that the danger to Appellant was ongoing. Finally, while Appellant does allege that he complained for a year about the use of pepper gas (App.10), and that

prison officials engaged in "continuing harassment, ploits [sic] to hurt or kill [him], and other forms of retaliation," (App.8, 9) such generalized allegations strike us as insufficient to connect the separate incidents mentioned above into a patter n of threats of serious physical injury that are ongoing.

> FN2. In his reply brief, Appellant contends for the first time that this interpretation of the statute runs counter to the protections assured by the Eighth Amendment. Appellant argues that "[t]he right to be free from serious physical injury while in prison is surely as fundamental as the right to divorce," citing as authority Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), and that, therefore, he is entitled to a waiver of filing fees as a matter of law. We will not discuss the merits of this contention because Abdul-Akbar waived this argument by not raising it in his opening brief. Ghana v. Holland, 226 F.3d 175, 180 (3d Cir.2000). "[The argument in the reply brief comes] too late.... Rule 28(a)(5) of the Federal Rules of Appellate Procedure and our Local Rule 28.1(a) require appellants to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief." Id .; see also Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir.1993) ("It is well settled that if an appellant fails to comply with these requirements on a particular issue, the appellant normally has abandoned and waived that issue on appeal and it need not be addressed by the court of appeals."). The dissent contends that Abdul-Akbar's waiver should be ignored because an assessment of the importance of a claimed constitutional interest is an implicit part of any equal protection or due process inquiry determining the level of scrutiny that will apply to a challenged government action. The dissent agrees with Abdul-Akbar that the right to be free from serious physical injury is just as weighty as the right to a divorce at issue in Boddie, and would hold that such a right represents a fundamental interest for Boddie purposes. Furthermore, the dissent also points to several other underlying rights, including the First Amendment right to free exercise of religion, that are not at issue in the instant case, but that the dissent would also presumably treat as fundamental interests under Boddie. What the dissent fails to recognize, however, is that the importance of the underlying right is largely immaterial to the question whether

that right is a fundamental interest for Boddie purposes. As we discuss infra in Part VI.B., an underlying constitutional entitlement rises to the level of a Boddie fundamental interest only when the government blocks the sole legal means for safeguarding that entitlement, and not simply because the interest itself is a weighty one.

FN3. Congress's rationale for placing the fee requirements on prisoners is captured in the statements of Senator Jon Kyl:

Section 2 will require prisoners to pay a very small share of the large burden they place on the Federal judicial system by paying a small filing fee upon commencement of lawsuits. In doing so, the provision will deter frivolous inmate lawsuits. The modest monetary outlay will force prisoners to think twice about the case and not just file reflexively. Prisoners will have to make the same decision that law-abiding Americans must make: Is the lawsuit worth the price? Criminals should not be given a special privilege that other Americans do not have.... The volume of prisoner litigation represents a large burden on the judicial system, which is already overburdened by increases in nonprisoner litigation. Yet prisoners have very little incentive not to file nonmeritorious lawsuits. Unlike other prospective litigants who seek poor person status, prisoners have all the necessities of life supplied, including the materials required to bring their lawsuits. For a prisoner who qualifies for poor person status, there is no cost to bring a suit and, therefore, no incentive to limit suits to cases that have some chance of success. The filing fee is small enough not to deter a prisoner with a meritorious claim, yet large enough to deter frivolous claims and multiple filings. 141 CONG. REC. S7498-01, S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl) (citation omitted).

FN4. The court acknowledges with appreciation the able pro bono representation of Appellant by the lawfirm of Jenner & Block.

FN1. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997)

FN2. In both Watson and our prior decision in In re Packer Avenue Associates, 884 F.2d 745 (3d Cir.1989), we adopted the approach of the District of Columbia Circuit in the leading case of In re

Green, 669 F.2d 779 (D.C.Cir.1981). See also Procup v. Strickland, 792 F.2d 1069,1072 n. 6 (11th Cir.1986) (en banc) ("Several courts have held that a total ban on all IFP filings by a particular litigant as a sanction for abuse is impermissible.") (citing Green and cases from Second, Ninth and Tenth Circuits; Joseph T. Lukens, The Prison Litigation Reform Act: Three Strikes and You're Out of Court--It May Be Effective, But Is It Constitutional?, 70 Temp. L.Rev. 471, n. 90-91 (Summer 1997) (providing extensive citations to circuit court cases requiring that injunctions be narrowly tailored to preserve access for legitimate claims). The sole difference between the preclusive effect of injunctions held impermissible in the cited cases and the statutory bar of section 1915(g) is that the latter includes a narrow exception (extremely narrow, as interpreted by the majority) which is patently insufficient to safeguard the broad scope of rights jeopardized by the IFP ban. Cf. Procup, 792 F.2d at 1074 (Clark, J., concurring) (construing limitation of IFP for abusive prisoner litigant to "claims alleging actual or threatened physical harm" to be "an unconstitutional denial of access").

FN3. Although dismissals for failure to state a claim do not necessarily signify abuse, they nonetheless count as "strikes" for purposes of section 1915(g). Moreover, the many procedural and substantive hurdles erected in the path of civil rights claims against government actors might easily trip up a pro se litigant with a bona fide claim. The majority's repeated characterization of the statutory bar as applying only to prisoners who "abuse" the judicial system by filing frivolous actions is therefore somewhat misleading.

FN4. See also, e.g., Maze v. Hargett, 1998 WL 378369 *3 (Apr. 27, 1998 N.D.Miss..) (finding "sufficiently imminent danger of future physical harm" during prisoner's "tenure" in light of continuing conditions).

FN5. BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp., 229 F.3d 254, 263 (3d Cir.2000) (citing Charles Alan W right, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure S 2948.1 at 139 (2d ed.1995) as "explaining that imminence requires that the harm will occur

before a trial on the merits can be had"). Another statute similarly "defines the threat of 'imminent danger' as the existence of a condition ... which could '[r]easonably be expected to cause substantial harm ... before such condition ... can be abated.' " Hodel v. Va. Surface Mining & Reclamation Assn., 452 U.S. 264, 301 (1981), quoting the Surface Mining Control and Reclamation Act, 30 U.S.C.S 1291(8) (1976 ed., Supp. III).

FN6. See also Choyce v. Dominguez, 160 F.3d 1068 (5th Cir.1998) (remanding for reconsideration of imminent danger determination where prisoner alleged incident complained of "was only one episode in an ongoing pattern of threats and violence" in retaliation for prior litigation).

FN7. Although many of the foregoing allegations may strike the reader as improbable, they are as yet uncontroverted, and I believe that we are required to accept them as true for present purposes. Cf. Gibbs, 116 F.3d at 86 (holding that a district court should accept the allegations in the Complaint in determining imminent danger for IFP purposes, pending the appearance of a defendant who may controvert the allegations).

FN8. Cf. Ashley, 147 F.3d at 717 (concluding imminent danger exception met in part because "complaint was filed very shortly [within one month] after the last attack"); Choyce, 160 F .3d at 1071 n. 4 (suggesting reconsideration in light of erroneous view that 17 months had passed since last injury, where actually complaint was filed in 40 days).

FN9. Cf. Wolff v. McDonnell, 418 U.S. 539, 562, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("Relationships among the inmates are ... perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner. .... The reality is that disciplinary hearings ... necessarily involve confrontations ... between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility....").

FN10. See Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997) (inmates' awareness of prisoner's status as informer subjected him to threats and attacks; Gibbs claimed his "life [was] in constant danger" and conditions were unaddressed until litigation filed; prisoner was transferred during pendency of appeal); see also supra n. 6 and accompanying text (discussing Ashley and Choyce).

FN11. The majority neglects duly to consider the actual averments of Appellant's complaint, instead observing that "at no point in the present litigation did Appellant seek to rely on an ongoing danger theory", Supra at 11 n. 1. To the contrary, Appellant's counsel stated at oral argument that "if you look to the complaint itself, ... he alleges a continuing course of conduct." Moreover, Appellant's counsel expressly "embrace[d]" the argument that the time at which imminent danger is assessed is not controlling, because "imminent really doesn't mean impending." In any event, the majority opines as to the sufficiency of allegations of ongoing harm, and in doing so applies too exacting a standard. Turning briefly to the complaint, the majority expresses "doubt whether [it] suffice[s] to establish such an ongoing danger." Supra at 12 n. 1. Of course, under our liberal pleading rules such a doubt should be resolved for, rather than against, Appellant. Similarly, the majority's observation that some of Appellant's allegations are "generalized" should not control our reading of the complaint. Even if those general allegations were not supported with specific facts, as they are here, a pleading should be deemed sufficient if it provides reasonable notice of the theories presented. See Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This lenity in pleading review is especially important as applied to an indigent, incarcerated, pro se litigant whose access to the courts is narrowly circumscribed.
The majority concludes that Appellant's allegations fall short because the several acts of which he complains are "unconnected", and do not form a "pattern". Supra at 12 n. 1. A fair reading of the complaint indicates, however, that the events are connected by two alleged ongoing factors: a long-established practice of arbitrary use of pepper gas against black inmates, and a specific animus on the part of the guards against Appellant. Moreover, in suggesting that the mere passage of time between the incidents and after the last incident means that the danger was no longer imminent at the time of filing, the majority disregards the continuing, unremedied nature of the factors that allegedly caused the incidents. Indeed, the occurrence of multiple incidents over a substantial time period supports rather than under mines the conclusion that Appellant's danger was ongoing.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

FN12. Cf. O'Shea, supra.

FN13. The majority's narrow reading of the exception will have a far- reaching effect, as persistent, ongoing imminent danger is a condition all too often encountered in our nation's prisons. Cf. Wolff, 418 U.S. at 562 (In many prisons, "[g]uards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment and despair are commonplace.").

FN14. Such correction may occur through formal intervention of the courts or through voluntary redress in response to a prisoner's invocation of the judicial process. Cf. Medberry v. Butler, 185 F.3d 1189 (11th Cir.1999) (prisoner subject to physical assaults transferred shortly after complaint was filed).

FN15. For example, prisoners who have been threatened or attacked are often subject to administrative solitary confinement or hospitalization, respectively. Moreover, our recent decisions in Booth v. Churner, 206 F.3d 289, 291 (3d Cir.2000) and Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir.2000) require the exhaustion of internal prison remedies as a prerequisite for filing an action under S 1983 or Bivens.

FN16. It should be noted that Choyce took a noticeably different approach from Banos v. O'Guin, 144 F.3d 883 (5th Cir.1998), the earlier Fifth Circuit case relied upon by the majority.

FN17. "It is a well established rule that needless constitutional adjudication is to be avoided, and, toward that end, that when 'a construction of the statute is fairly possible by which the [constitutional] question may be avoided,' such construction should be given" Roe v. Casey, 623 F.2d 829 (3d Cir.1980) (Hunter, J., concurring) (quoting Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (additional citations omitted).

FN18. The same level of scrutiny also applies to laws that impose burdens based on a "suspect" classification. The majority reasons that neither prisoners nor indigents are suspect classes. It does not necessarily follow that the intersection of these classes--the class of indigent prisoners--is not suspect. After all, possessing neither means nor liberty (and having incurred the disapprobation of society), indigent prisoners are a discrete, insular minority that is perhaps the group least able to protect its fundamental rights through majoritarian processes. Cf. United States v. Carolene Products Co., 304 U.S. 144, 152-53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) ("whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry") (citations omitted).

FN19. Chapter 29 of the Magna Carta provided: "To none will we sell, to none will we deny or delay, right or justice." Magna Carta, c. 29 [c. 40 of King John's Charter of 1215; c. 29 of King Edward's Charter of 1297] (1225), quoted in Burkett v. Cunningham, 826 F.2d 1208, 1219 (3d Cir.1987). The effect of this guaranty was explained by Sir Edward Coke as follows:
[E]very subject ... for injury done to him ..., by any other subject, be he ... free, or bond, ... or be he outlawed, ... or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay.
Coke, The Second Part of the Institutes of the Laws of England 55 (Brooke, 5th ed. 1797), quoted in Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

FN20. See, e.g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (holding that state courts may not deny appellate review to criminal defendants due to their inability to pay transcript fees); Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959) (requiring states to waive filing fees for indigent prisoners in criminal cases); Boddie v. Connecticut, 401 U.S. 371, 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (extending Griffin to civil divorce context, reasoning that "a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party's opportunity to be heard."); Johnson v. Avery, 393 U.S. 483, 485-86, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), (striking down ban on prisoners assisting other inmates with habeas corpus petitions, explaining that "it is fundamental that access of prisoners to the Courts for the purpose of presenting their complaints may not be denied or obstructed", and observing that "a State may not validly make the writ

available only to prisoners who could pay a $4 filing fee."); Wolff, supra (applying holding and rationale of Avery to civil rights actions).

FN21. See Lewis v. Casey, 518 U.S. 343, 354, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (stating that Wolff "extended the right of access to the courts" to " 'civil rights actions'--i.e., actions under 42 U.S.C. S 1983 to vindicate 'basic constitutional rights.' ").

FN22. Cf. Lewis, 518 U.S. at 350 (describing the "right of access to the courts" as "already well-established" when Bounds was decided).

FN23. Only twice in our history has the Supreme Court approved exaction of fees which had the effect of excluding an indigent would-be party from court. Both cases involved gratuitous government benefits, rather than underlying constitutional rights. See United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1972) (bankruptcy); Ortwein v. Schwab, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973) (welfare).

FN24. See also Adams v. Carlson, 488 F.2d 619, 630 (7th Cir.1973) ("[A]n inmate's right to ... access to the courts is as fundamental a right as any other he may hold.... All other rights are illusory without it."); Lewis, 518 U.S. at 405 n. 1 (Stevens, J ., dissenting) ("Without the ability to access the courts and draw their attention to constitutionally improper behavior, ... prisoners ... would be deprived of the first--and often the only--'line of defense' against constitutional violations.").

FN25. See Joshua D. Franklin, Three Strikes and You're Out of Constitutional Rights? The Prison Litigation Reform Act's "Three Strikes" Provision and its Effect on Indigents, 71 U. Colo. L.Rev. 191, 194 ("When an indigent prisoner with three strikes seeks to litigate a matter affecting a fundamental interest, any legislation that substantially burdens the right of access to the courts must be subject to strict scrutiny review, rather than the more deferential rational relation standard of review.").

FN26. The majority asserts that Appellant waived his argument that the right to be free from serious

physical injury is as fundamental as the right to divorce (as to which a right of access to court was recognized in Boddie); but surely an assessment of the importance of the infringed interest is implicitly part of every due process or equal protection challenge. In any event, so long as we are addressing the level of scrutiny to apply, we cannot avoid deciding whether a fundamental right is burdened.

The majority responds that "the importance of the underlying right is largely immaterial to the question whether that right is a fundamental interest for Boddie purposes", because "an underlying constitutional entitlement rises to the level of a Boddie fundamental interest only when the government blocks the sole legal means for safeguarding that entitlement...." Supra at 13 n. 2. I believe this response conflates the elements of fundamental right and burden: the importance of the right at stake is precisely what determines whether it is "fundamental"; while the availability of other means to safeguard the right may help to determine the extent to which the right is burdened, it has no bearing on whether the burdened right is fundamental.

FN27. This right is embodied in the Eighth Amendment prohibition against cruel and unusual punishments.

FN28. See Wolff, 418 U.S. at 556 ("Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race.").

FN29. Although the majority marshalls to its support cases from five other circuits which have applied a rational basis review to section 1915(g), four of these cases were explicitly premised on the absence of an underlying fundamental interest. See Carson v. Johnson, 112 F.3d 818, 821 (5th Cir.1997) (holding prisoner had no fundamental interest in subject of suit); Rivera v. Allin, 144 F.3d 719, 724 (11th Cir.1998) ("Rivera's well-pled allegations ... plainly advance no cognizable fundamental interest."); Rodriguez v. Cook, 169 F.3d 1176, 1180 (9th Cir.1999) (agreeing with Carson and Rivera that "where a fundamental interest is not at stake, section 1915(g) does not infringe upon an inmate's meaningful access to the courts"); White v. Colorado, 157 F.3d 1226, 1233-34 (10th Cir.1998) (recognizing right of action extends to suits seeking to vindicate basic constitutional rights, but concluding that

prisoner failed to state a claim for violation of the Eighth Amendment). The fifth case, Wilson v. Yaklich, 148 F.3d 596 (6th Cir.1998), acknowledged that the constitutional right of access to the courts "is indeed 'fundamental' " and that a prisoner's access must be "adequate, effective and meaningful", but found that the right was not infringed solely because the prisoner still had recourse to state court. Id. at 605 (citations omitted).

FN30. See also Stacey H. O'Bryan, Note, Closing the Courthouse Door: The Impact of the Prison Litigation Reform Act's Physical Injury Requirement on the Constitutional Rights of Prisoners, 83 V a. L.Rev. 1189, 1202-10 (1997) (mentioning the right to be free from racial segregation, the right to privacy, and the right to be free from non-physical violations of the Eighth Amendment as among those left unprotected as to prisoners barred from litigation by section 1915(g)).

FN31. Cf. n. 19, supra (discussing Magna Carta's prohibition against sale, delay or denial of justice).

FN32. According to the majority, Congress "[r]ecogniz[ed] that it could take prisoners a significant period of time to obtain the filing fee in some cases". Supra at 11.

FN33. See also Banos, 144 F.3d at 885 n. 1 ("It is possible that a potential litigant who is denied IFP status under this provision will not have the ability to pay the entire filing fee within the statute of limitations or, in the case of an appeal, within the time for filing an appeal, and will thereby be precluded from litigating or appealing his case on the merits.").

FN34. As the majority correctly observes, the Court's ruling in Boddie turned on the State's monopoly over divorce actions and the resultant absence of any "recognized, effective alternatives" for resolution. Boddie, 401 U.S. at 375-76. The case does not, however, stand for the proposition that availability of a state forum justifies selective denial of access to a federal forum for the vindication of federal civil rights claims.

FN35. If, as appears to be the case, the statute's constitutionality as applied to suits based on

fundamental rights hinges on the availability of an adequate state forum, we should make this limitation explicit in order to guide the District Courts.

FN36. The argument that federal courts may turn a deaf ear to those who have access to state courts "disregards the historic importance of access to federal courts to pursue civil rights claims under 42 U .S.C. S 1983." Lukens, The Prison Litigation Reform Act, 70 Temp. L.Rev. at 512. Cf. Monroe v. Pape, 365 U.S. 167, 174, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (one purpose of S 1983 "was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice"); McCarthy, 503 U.S. at 153 ("federal courts must take cognizance of the valid constitutional claims of prison inmates") (citations omitted).

It is important to note that the Supreme Court has expressly rejected the converse argument that the availability of a federal remedy justified a filing fee that effectively barred indigent prisoners from state court. See Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961). To paraphrase the Court's admonition, "it would ill-behoove this great [nation], whose devotion to the equality of rights is indelibly stamped upon its history, to say to its indigent prisoners seeking to redress what they believe to be [violations of federal law]: 'go to the [state] court.' " Id. at 713.

FN37. See, e.g., 41 Pa.C.S.A. S 6602(f) (West Supp.1999); La.Rev.Stat. Ann. S 1187 (West Supp.1999). See also Laurie Smith Camp, Why Nebraska Needs Prison Litigation Reform, 76 Neb. L.Rev. 781, 781 (1997) (proposing parallel state legislation in Nebraska); Three Strikes, 71 U. Colo. L.Rev. at 209-210 (predicting that"[o]ther states are likely to respond similarly to the influx of claims brought by [prisoners] who are otherwise precluded from bringing suit in forma pauperis").

FN38. In its amicus brief, Pennsylvania argues that a state forum is available, but inexplicably neglects to notify us that the purported alternative is generally unavailable to Pennsylvania prisoners with claims concerning prison conditions.

FN39. See The Prison Litigation Reform Act, 70 Temp. L.Rev. at 513-517 (observing that if defendant removes the case to federal court as permitted under 28 U.S.C. S 1441, plaintiff may

2001 WL 76277
(Cite as: 2001 WL 76277, *18 (3rd Cir.(Del.)))

Page 23

lose his right to appeal the federal claims if he is within the provisions of section 1915(g) and cannot afford prepayment in full; he may also be unable to appeal pendent state claims over which the district court exercised jurisdiction).

FN40. See Griffin, 351 U.S. at 18 ("It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all. But that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty."); See also Three Strikes, 71 U. Colo. L.Rev. at 209 (noting that"[a]lthough the right to an appeal is not constitutionally guaranteed, equal protection concerns nevertheless arise when this right is effectively denied to only one class of litigant") (citing Douglas v. California, 372 U.S. 353, 357-58, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963)).

FN41. Cf. Frank I. Michelman, The Supreme Court and Litigation     Access Fees: The Right to Protect One's Rights--Part II, 1974 Duke L .J. 527, 559 (observing that a fixed fee's deterrent effect on frivolous filings will vary inversely with the individual's finances, with the truly indigent being "totally 'deterred' "). Michelman concludes that " 'Deterrence' in any acceptable sense of that term, can be depended upon to operate only on that group of citizens to whom [the fee] will seem neither a prohibitive sum, nor, on the other hand, a trifling amount to pay for the privilege of demanding one's rights." Id.

FN42. In the present case, according to the District Court, only one of Appellant's disqualifying dismissals occurred after the effective date of the PLRA.App. 20.

FN43. See 28 U.S.C. S 1915(b)(4) (Supp. III 1997) (providing that "[i]n no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee."). This saving provision is inapplicable to prisoners subject to section 1915(g).

FN44. The majority's discussion does not say how the three strikes rule is supposed to further deterrence. Instead, it seems to say that the three strikes rule is rationally related to its goal because it is within congressional power. See supra at 18 ("Preventing frequent filers from obtaining fee

waivers is rationally related to the legitimate government interest of deterring frivolous lawsuits because 'Congress is no more compelled to guarantee free access to federal courts than it is to provide unlimited access to them.' "). This is patently a non sequitur.

FN45. See, e.g., Mary Tushnet and Larry Yackle, Symbolic Statutes and Real Laws: The Pathologies of the Antiterrorism and Effective Death Penalty Act and the Prison Litigation Reform Act, 47 Duke L.J. 1 (Oct.1997) ("[N]otably, the statute allows any prisoner who can pay the complete filing fee in advance to file as many frivolous or malicious lawsuits as she wants.").

FN46. Compare Watson, 901 F.2d 329, 331 (finding denial of constitutional right where blanket bar to IFP filings failed to "consider [ ] the effects on a legitimate claim").

FN47. Illustrating the "general inappropriateness of withdrawing the in forma pauperis privilege as a means to curtail ... abuse", the Green court observed:
On the one hand, Green is totally free to flood the courts with paper provided that he pays the going rate: orders erecting financial barriers are only as effective as the litigant is truly impoverished. On the other hand, these restrictions are clumsily over inclusive: if Green does not have the money to file a frivolous claim, he also does not have the money to file a legitimate one.
669 F.2d 779.

FN48. The injunction that apparently remains in effect against Appellant, setting special filing preconditions in response to his history of abuse, is but one example. See supra at 4. Another example is the PLRA's own provision for judicial screening. Under section 1915A, a court may review and assess the merit of a prisoner's claims before docketing. See 28 U.S.C. S 1915A(a)-(b) (Supp. III 1997). These measures, directed at particular abusers and particular frivolous claims, are clearly more narrowly tailored to serve their proper end than the three strikes classification, which lumps good faith err or with abuse and stifles meritorious claims along with frivolous ones. See Lukens, The Prisoner Litigation Reform Act, 70 Temp. L.Rev. at 505-06 (observing that "Section 1915(g) ... treats the prisoner who has filed otherwise meritorious claims, but failed to name the proper party, ... in the same manner as the litigant who sued the President ... for

stealing the multiplication tables from him.")

FN49. The District Court in Lyon noted that, unlike the traditional discretionary power of the courts to limit abusive litigation by an individual prisoner based on his particular circumstances, the "three dismissal rule" gave no consideration to, e.g., length of incarceration, number of meritorious actions, or "other pertinent information that might guide a federal court in properly limiting abuse...." Lyon, 940 F.Supp. at 1438. Applying a strict scrutiny review, the District Court held section 1915(g) violative of equal protection. The Eighth Circuit undertook no constitutional review, finding instead that the plaintiff lacked standing because he had sufficient funds.

FN50. The majority's response that constitutional constraints require "neither a perfect nor even best available fit" between statutory ends and means, supra at 18, quoting United States v. Mariani, 212 F.3d 761, 774 (3d Cir.2000) (en banc), is not entirely apt. Section 1915(g) is not constitutionally deficient because it is merely imperfect or sub-optimal; rather, its very high degree of both under- and over- inclusiveness renders it an extremely poor fit. Cases such as Mariani, which permit a certain degree of under-inclusiveness in statutes that burden First Amendment rights, therefore do not advance the inquiry. In the context of an equal protection challenge to a bur den on access to the courts, the Supreme Court has found the same type of under-and over-inclusiveness at issue here to be constitutionally impermissible. See Rinaldi, supra at 41-42.

FN51. This conclusion is in accord with an apparent consensus among commentators who have addressed the constitutionality of the PLRA's three strikes provision. See, e.g., Lukens, The Prison Litigation Reform Act, supra n. 36; Franklin, Three Strikes, supra n. 25; David C.Leven, Justice for the Forgotten and Despised, 16 Touro L.Rev. 1, 15 (Fall 1999); Mary Tushnet and Larry Yackle, Symbolic Statutes and Real Laws: The Pathologies of the Antiterrorism and Effective Death Penalty Act and the Prison Litigation Reform Act, 47 Duke L.J. 1, 70 (Oct.1997); Simone Schonenberger, Access Denied: The Prison Litigation Reform Act, 86 Ky. L.J. 457 (1997-1998); Catherine G. Patsos, The Constitutionality and

Implications of the Prison Litigation Reform Act, 42 N.Y.L. Sch. L.Rev. 205 (1998).

FN52. In addition to its infirmity on equal protection grounds, section 1915(g) raises troubling questions concerning the constitutional prohibition against bills of attainder and ex post facto laws, in that it operates as an extra-judicial punishment against an identified group based on their past conduct. As noted by the majority, the three strikes rule seeks to deter prisoner litigation by "disqualifying frequent filers who have failed in the past to carefully evaluate their claims prior to filing." Supra at 17. Cf. Hughes Aircraft Co. v. United States, 520 U.S. 939, 947, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (stating that a statute which "attaches a new disability, in respect to transactions ... already past, must be deemed retrospective") (quoting Soc. for Propagation of the Gospel v. Wheeler, 22 F. Cas. 756, 767 (No. 13,156) (C.C.N.H.1814) (Story, J.)).

The Supreme Court has identified three requirements for finding that a challenged statute is a bill of attainder: "specification of the affected persons, punishment, and lack of a judicial trial." Selective Service System v. Minnesota Public Interest Research Group, 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). As to the first element, section 1915(g) plainly is directed toward "specifically designated persons or groups". Id., quoting United States v. Brown, 381 U.S. 437, 447, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). The affected prisoners are identified by an objectively ascertainable, immutable characteristic--three or more prior "strikes"--and are commonly referred to in cases and congressional debate by a common pejorative title ("frequent filers"). As to the second element, the majority appears to acknowledge a punitive purpose and effect: "Potentially negative consequences in federal courts ... are precisely the consequences intended by Congress. The outcome predicted by Appellant [i.e., that a prisoner "could forever lose his ability to bring his suit as a practical matter"] is ... exactly what Congress intended." Supra at 10-11. Cf. Green, 669 F.2d at 786 (characterizing as "simply punitive" a prepayment requirement which "is not geared to discerning whether each claim presents a new nonfrivolous issue" and whichs seeks to "deter" by "assum[ing]" that the affected prisoner "will not be able to meet the required filing fee").

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

2001 WL 76277                                                                      **Page 25**
**(Cite as: 2001 WL 76277, \*18 (3rd Cir.(Del.)))**

Finally, as to the third element, section 1915(g) imposes its deprivation without any judicial trial. Cf.    Lyon, 940 F.Supp. at 1438 (contrasting blanket bar of section 1915(g) with particularized discretion attendant on judicial proceeding to limit abusive litigation).

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



EXHIBIT

A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN RICHARD JAE, | : | CIVIL NO. **1:CV-98-1515** |
| | : | |
| Plaintiff | : | (Chief Judge Rambo) |
| | : | |
| v. | : | (Magistrate Judge Smyser) |
| | : | |
| CAPT. R. GLENNY, | : | |
| LT. SUNDERLAND, | : | |
| SGT. HEASTER and | : | **FILED** |
| OFFICER GROVE, | : | HARRISBURG, PA |
| | : | |
| Defendants | : | APR 2 1 1999 |

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

<u>ORDER</u>

The plaintiff, a state prisoner proceeding *pro se*,
commenced this 42 U.S.C. § 1983 action by filing a complaint on
September 11, 1998.  At the time the plaintiff filed the
complaint he was incarcerated at the State Correctional
Institution at Smithfield.  The plaintiff is currently
incarcerated at the State Correctional Institution at Camp
Hill.

The plaintiff alleges the following facts in his
complaint.  On July 14, 1998, the plaintiff was physically
assaulted by defendants Heaster and Grove while defendant
Sunderland watched. (Complaint at ¶1).  More specifically, the
plaintiff alleges that while he was on the floor, handcuffed

and in a security belt, he was dragged into the B side of the RHU and punched in his right side. *Id.* at ¶2.   Once the plaintiff was in his cell and was laying on the floor on his belly, defendant Grove kicked the plaintiff several times in his side and took his thumb and pushed the plaintiff's ear hard against his head. *Id.*   Then the plaintiff's security belt was undone, but the plaintiff was still in handcuffs. *Id.* at ¶3. All the officers left the plaintiff's cell and locked the cell door. *Id.*  Defendant Grove and Heaster then attempted to pull the plaintiff to the cell door by the ends of the security belt. *Id.* Defendants Grove and Heaster used an excessive amount of force and kept yanking on the ends of the belt and yelling at the plaintiff to get up. *Id.*  The plaintiff told them that he could not get up because he was in an awkward position and because he is overweight. *Id.*   Defendants Grove and Heaster then using extreme force yanked the plaintiff to his feet by pulling on the ends of the belt. *Id.* at ¶4.  As a result the plaintiff's handcuffs cut down deep into his hands causing his radial nerves in his wrist to become pinched. *Id.* at ¶5.  The plaintiff hands were numb for over seventy-two hours, and the plaintiff suffered bruises and lacerations on both hands which became raw and infected. *Id.*

2

While the above-described incident was taking place defendant Sunderland stood by watching and did nothing to stop the use of force. *Id.* at ¶6.  Defendant Glenny refused to investigate the above-described incident. *Id.* at ¶7.

Immediately after the incident Captain Pyles and Dr. Long came to the plaintiff's cell and saw the plaintiff's injuries when they were at their worst. *Id.* at ¶9.  Nurse Donna Myers came to the plaintiff's cell with a camera and took photographs of the plaintiff's injuries and filed an incident report. *Id.* at ¶10.

The plaintiff alleges that he is under imminent danger of serious physical injury. *Id.* at ¶11.

The plaintiff filed an application to proceed *in forma pauperis*.  In his application that plaintiff acknowledges that he has had three or more action or appeals in a court of the United States that were dismissed as frivolous, malicious, or for failure to state a claim upon which relief may be granted.  (Doc. 9 Question 3(a)).  The plaintiff states in the application that he is under imminent danger of serious physical injury because of the nature of the incident alleged

3

in the complaint and because as long as the plaintiff remains
at SCI-Smithfield the defendants may retaliate against him.
(Doc. 9, Question 3(b)).

By an Order dated December 1, 1999, the plaintiff's
application to proceed *in forma pauperis* was granted.

On February 1, 1999, the defendants filed a motion
(doc. 18) to revoke the plaintiff's *in forma pauperis* status,
and on February 8, 1999, the defendants filed another motion
(doc. 20) to revoke the plaintiff's *in forma pauperis* status
and to defer filing a responsive pleading.   We will refer to
both of these motions as the defendants' motion to revoke the
plaintiff's *in forma pauperis* status.   The defendants requested
and received an extension of time until March 11, 1999, to file
a brief in support of their motion.   On March 11, 1999, the
defendants filed a brief in support of their motion to revoke
the plaintiff's *in forma pauperis* status and documents in
support of their motion.

On March 24, 1999, the plaintiff filed a motion for
leave to file a brief in excess of fifteen pages.   On April 2,
1999, the plaintiff filed a brief exceeding fifteen pages in

4

opposition to the motion to revoke his *in forma pauperis* status.  We will grant the plaintiff's motion for leave to file a brief in excess of fifteen pages and we will accept as proper the plaintiff's brief filed on April 2, 1999.

28 U.S.C. §1915(g) (commonly referred to as the three-strikes provision) provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

The plaintiff has had twelve prior cases or appeals dismissed as frivolous. (Doc. 26 Exhibit A - L).  Because the plaintiff has had at least three cases or appeals dismissed as frivolous, he may not proceed *in forma pauperis* in this action unless he is under imminent danger of serious physical injury.

5

In *Gibbs v. Roman*, 116 F.3d 83 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit addressed the imminent danger element of the three-strikes provision.

The court held and reasoned:

> We hold, therefore, that a complaint alleging imminent danger – even if brought after the prior dismissal of three frivolous complaints - must be credited as having satisfied the threshold criterion of § 1915(g) unless the "imminent danger" element is challenged.  If the defendant, after service, challenges the allegations of imminent danger . . . the district court must then determine whether the plaintiff's allegation of imminent danger is credible, as of the time the alleged incident occurred, in order for the plaintiff to proceed on the merits i.f.p.  Of course, if the defendant disproves the charge that the plaintiff was placed in imminent danger at the time of the incident alleged, then the threshold criterion of § 1915(g) will not have been satisfied and the plaintiff may not proceed absent the payment of the requisite filing fee.  We emphasize that the proper focus when examining an inmate's complaint filed pursuant to § 1915(g) must be the imminent danger faced by the inmate at the time of the alleged incident, and not at the time the complaint was filed.
>     In resolving a contested issue of imminent danger, the district court may rely upon evidence supplied by sworn affidavits or depositions, or, alternatively, may hold a hearing.

*Id.* at 86-87 (footnote omitted).

6

In the instant case, the defendants have challenged the plaintiff's claim of imminent danger.  The defendants have submitted unsworn declarations under the penalty of perjury from defendant Sunderland, Jerome Safko, defendant Grove, Donald Barcelona and Donna Myers.  The defendants have also submitted a videotape of the alleged incident involving the plaintiff on July 14, 1998.

Defendant Sunderland states the following in his declaration.  He is a corrections lieutenant at SCI-Smithfield. (Sunderland Decl. at ¶1).  As lieutenant, his duties include supervising and assisting corrections officers in quelling inmate disturbances that occur within the institution. *Id.* at ¶2.  If he supervises or assists in an inmate disturbance he is required to file an extraordinary incident report detailing the chronological events of the incident, the actions taken by staff to quell the incident, any injuries that occurred, and the amount of force used by staff to quell the disturbance. *Id.* at ¶3.

On July 14, 1998, at 9:30 a.m. Sunderland was assigned to the Restricted Housing Unit (RHU) Hearing Room on J

7

Block. *Id.* at ¶4.  The plaintiff was having a misconduct

hearing before Hearing Examiner Mitchell. *Id.* at ¶5.  At 9:45,

Hearing Examiner Mitchell dismissed the plaintiff from the room

because of the plaintiff's behavior during the hearing. *Id.* at

¶6.  The plaintiff immediately jumped up, grabbed the telephone

and attempted to throw it at Mitchell and the secretary in the

room. *Id.* at ¶7.  Sunderland and Corrections Officer Barcelona

grabbed the plaintiff as he was moving toward Hearing Examiner

Mitchell. *Id.* at ¶8.  The plaintiff began to struggle and was

taken to the floor so that the officers could control his

behavior. *Id.*  The plaintiff was given multiple orders to

release the telephone and calm down. *Id.*  The plaintiff refused

to release the telephone and attempted to bite CO Barcelona and

defendant Sunderland. *Id.* at ¶9.  Sunderland physically removed

the telephone from the plaintiff's hands. *Id.*

     While CO Barcelona and defendant Sunderland were on

the floor with the plaintiff, defendant Heaster, CO Wyles, and

CO Beard came in and helped to remove the plaintiff from the

hearing room. *Id.* at ¶10. The plaintiff attempted to bite and

kick the officers who were present. *Id.*  Once the plaintiff was

subdued and controlled, Sunderland ordered him several times to

stand on his feet. *Id.* at ¶11.  The plaintiff refused and

8

stated that he was going to cut Sunderland's "fucking heart out." *Id.* Sunderland ordered the officers to take the plaintiff back to his cell. *Id.* at ¶12. Officer Safko and defendant Grove arrived and assisted. *Id.* The plaintiff continued to attempt to bite and kick at the officers and he was forcibly taken back to his cell. *Id.*

Defendant Sunderland ordered CO Safko to get the video camera in order to record the events that took place in the plaintiff's cell. *Id.* at ¶13. CO Safko videotaped the incident at the plaintiff's cell. *Id.*

Once the plaintiff was placed in his cell, defendant Sunderland asked the plaintiff to calm down. *Id.* at ¶14. The plaintiff continued in his agitated state. *Id.* Sunderland gave the plaintiff several orders to stand but he refused. *Id.* at ¶15. The plaintiff again threatened the officers that he was going to cut their "fucking hearts out" and again attempted to bite them. *Id.*

At about 9:54 a.m., Sunderland ordered a tether to be placed on the plaintiff's handcuffs and waist belt and ordered the officers to exit the cell. *Id.* at ¶16. Sunderland states

9

that the tether was placed on the plaintiffs handcuffs for the
following reasons: the plaintiff refused to comply with orders
to stand up and to go to the cell door to have his handcuffs
removed; each time an officer tried to control the waist belt
the plaintiff attempted to bite him; allowing the plaintiff to
keep the handcuffs inside the cell was a security risk in that
the handcuffs could be used as a weapon in the future when an
officer entered the cell; and the tether, which is a cord
attached to the handcuffs, allowed all the officers to exit the
cell safely and provided the means to guide the plaintiff to
the "pie hole" to remove his handcuffs. *Id.* at ¶17.  As the
officers were exiting the cell, the plaintiff again attempted
to bite the officers. *Id.* at ¶18.  The plaintiff refused to
stand and used his substantial weight (approximately 350
pounds) to pull against the officers as they tried to bring him
to the cell door. *Id.* at ¶19.  Throughout the process the
plaintiff screamed that the officers were hurting him. *Id.* at
¶20.  Sunderland states, however, that the force that was used
was in direct response to the plaintiff's attempt to keep the
handcuffs, waist belt, and tether inside the cell with him. *Id.*
After a few minutes of resistance, the plaintiff came to this
knees and quit fighting against the tether. *Id.* at ¶21.  The
handcuffs and tether were safely removed. *Id.*

10

Sunderland states that during the entire incident
reasonable force was used on the plaintiff so that he would
comply with orders. *Id.* at ¶22.  Specifically, the plaintiff
was forcibly taken back to his cell after he refused to stand
and voluntarily walk; Sunderland held the plaintiff's head with
an open hand to prevent him from biting; Sunderland placed his
foot on the plaintiff's leg to prevent him from kicking; and a
tether was applied to the plaintiff handcuffs and waist belt so
that they could be safely removed. *Id.*  Sunderland states that
the amount of force used by him and the other officers was only
the force necessary to obtain compliance and was used to
protect corrections officers and staff from harm. *Id.* at ¶23.

Corrections Officer Jerome Safko states the following
in his declaration.  On July 14, 1998, at 9:47 a.m., he was
ordered to report to the RHU Hearing Room on J Block to assist
officers in quelling a disturbance. (Safko Decl. at ¶4).  As he
entered the Hearing Room, he observed the plaintiff on the
floor with defendant Sunderland and CO Barcelona. *Id.* at ¶5.
After the plaintiff was subdued, Sunderland ordered the
plaintiff multiple times to stand to walk back to his cell. *Id.*
at ¶6. The plaintiff refused the orders. *Id.*   Safko grabbed
the plaintiff's right foot and assisted defendant Sunderland,

11

CO Beard, CO Wyles, defendant Grove and CO Barcelona in dragging the plaintiff back to his cell. *Id.* at ¶7. In the process of taking the plaintiff back to his cell, the plaintiff continually attempted to kick and bite the officers. *Id.* at ¶8. At about 9:50 a.m., they arrived at the plaintiff's cell, and Sunderland ordered Safko to get the video camera. *Id.* at ¶9. Upon retrieving the video camera, Safko states that he recorded Sunderland, Heaster, Beard, Wyles, Grove, Barcelona and plaintiff inside the cell. *Id.* at ¶10. Safko states that the videotape is a fair and accurate representation of the events that took place on July 14, 1998 involving the plaintiff. *Id.* at ¶11. Safko states that the amount of force used was only the force necessary to obtain compliance and was used to protect corrections officers and staff from harm. *Id.* at ¶12.

Defendant Grove states the following in his declaration. On July 14, 1998, at 9:45 a.m., he was ordered to report to the RHU Hearing Room on J Block to assist officers in quelling a disturbance. (Grove Decl. at ¶4). At approximately, 9:47 a.m. he entered the RHU Hearing Room and observed the plaintiff on the floor. *Id.* at ¶5. Defendant Sunderland and CO Barcelona were also on the floor trying to subdue the plaintiff. *Id.* Grove immediately assisted the officers in

12

subduing the plaintiff. *Id.* at ¶6.   After the plaintiff was subdued, defendant Sunderland gave the plaintiff multiple orders to stand and walk back to his cell. *Id.* at ¶7.   The plaintiff refused the orders. *Id.*   Grove grabbed the plaintiff's security belt and assisted in carrying the plaintiff back to his cell.   *Id.* at ¶8.   In the process of taking the plaintiff back to his cell, the plaintiff attempted to kick and bite the officers. *Id.* at ¶9.   When they arrived at the plaintiff's cell, Sunderland ordered the plaintiff to roll over so that his security belt could be taken off. *Id.* at ¶10. The plaintiff replied that if they took the belt off he would bite someone. *Id.*   At 9:52 a.m., Sunderland ordered CO Barcelona to put a tether on the plaintiff's handcuffs, and Sunderland ordered the officers to take off the plaintiff's security belt. *Id.* at ¶11-12.   In the process the plaintiff again attempted to bite and kick the officers. *Id.* at ¶12. Defendant Grove placed his thumb against the plaintiff's jaw and applied pressure until the plaintiff complied with the orders. *Id.*   After momentary compliance, the plaintiff again tried to bite the officers. *Id.* at ¶13.   Defendant Grove resumed applying pressure to the plaintiff jaw until the security belt was removed. *Id.*   At 9:55, the officers exited the cell, and the plaintiff was pulled with the tether to the

13

"pie hole" in the cell door so that his handcuffs could be removed. *Id.* at ¶14. Grove states that the amount of force used was only the force necessary to obtain compliance and was used to protect corrections officers and staff from harm. *Id.* at ¶15.

Corrections Officer Barcelona states the following in his declaration. On July 14, 1998, at 9:30 a.m., he was assigned to the RHU Hearing Room on J Block. (Barcelona Decl. at ¶4). The plaintiff was having a misconduct hearing before Hearing Examiner Mitchell. *Id.* at ¶5. At 9:45 a.m., Hearing Examiner Mitchell rendered a guilty verdict in the plaintiff's case. *Id.* at ¶6. The plaintiff immediately jumped up, grabbed the telephone and attempted to throw it at Mitchell and the secretary in the room. *Id.* at ¶7. Barcelona and Sunderland grabbed the plaintiff as he was moving toward Hearing Examiner Mitchell. *Id.* at ¶8. The plaintiff began to struggle and was taken to the floor so that the officers could control his behavior. *Id.* The plaintiff was given multiple orders to release the telephone and calm down. *Id.* The plaintiff refused to release the telephone and attempted to bite CO Barcelona and defendant Sunderland. *Id.* at ¶9. Sunderland physically removed the telephone from the plaintiff's hands. *Id.*

14

While CO Barcelona and defendant Sunderland were on the floor with the plaintiff, defendant Heaster, CO Wyles, and CO Beard came and assisted in removing the plaintiff from the hearing room. *Id.* at ¶10. The plaintiff attempted to bite and kick the officers who were present. *Id.* Once the plaintiff was subdued, Sunderland ordered him several times to stand on his feet. *Id.* at ¶11. The plaintiff refused and stated that he was going to cut Sunderland's "fucking heart out." *Id.* Sunderland ordered the officers to take the plaintiff back to his cell. *Id.* at ¶12. Officer Safko and defendant Grove arrived and assisted. *Id.* The plaintiff continued to attempt to bite and kick at the officers as he was drug back to his cell. *Id.*

The plaintiff was placed in his cell and Sunderland spoke to the plaintiff and told him to calm down. *Id.* at ¶13. Sunderland ordered the plaintiff to stand, but the plaintiff refused. *Id.* at ¶14. The plaintiff again threatened the officers saying that he was going to cut their "fucking hearts out." *Id.* The plaintiff continued his attempts to kick and bite the officers. *Id.* At 9:45 a.m., a tether was placed on the plaintiff's handcuffs and waist belt and Sunderland order the officers to exit the cell. *Id.* at ¶15. As the officers

15

were exiting the cell the plaintiff refused to stand and resisted the force used on the tether. *Id.* at ¶16. After a few minutes of non-cooperation, the plaintiff quit fighting against the tether. *Id.* at ¶17. The plaintiff's handcuffs were safely removed through the "pie hole" in the cell door. *Id.* Barcelona states that the amount of force used was only the force necessary to obtain compliance and was used to protect corrections officers and staff from harm. *Id.* at ¶18.

Donna Myers states the following in her declaration. She is a nurse at SCI-Smithfield. (Myers Decl. at ¶1). As a nurse her duties include evaluating injuries and rendering medical assistance to inmates involved in disturbances that occur within the institution. *Id.* at ¶3. Her duties also require that she file a Medical Incident/Injury Report detailing the inmate's name, location of the incident, how the inmate was injured, a description of the injury, whether the inmate was seen by a physician, an initial impression of the injury and the treatment rendered. *Id.* at ¶4. On July 14, 1998, at approximately 10:30 a.m., Myers was ordered to report to the plaintiff's cell. *Id.* at ¶5. Myers completed and signed the Medical Incident/Injury Report which is attached to her declaration. *Id.* at ¶6. Myers states that the Report fairly

16

AO 72A

and accurately reports the condition of the injuries that the plaintiff sustained in the aftermath of the July 14, 1998 incident in the RHU as observed and noted by her in her examination of the plaintiff on that date. *Id.* at ¶7.

The Medical Incident/Injury Report is a two page document. (Myers Decl. Exhibit).   In addition to identifying the plaintiff, the date, time and place of the incident, the report states that "upon exam, indents noted on both wrists. inmate c/o "cuffs being too tight" no edema or bruising noted to either hand.  No cuts or abrasions." *Id.* The Report also states that the plaintiff denies problems with anything else and that no marks or abnormalities noted to any other body part. *Id.*   The Report also indicates that no treatment is needed at this time. *Id.*

The videotape submitted by the defendants begins at a point in time when the plaintiff in lying on his stomach on his cell floor.   The videotape does not give a clear indication of all that was happening.   The videotape does show the officers using restraining force on the plaintiff.   The plaintiff is heard threatening harm to the officers if they take off his

17

handcuffs.  The plaintiff is also heard to express that the force being used is causing him pain.

The plaintiff has not submitted any declarations in opposition to the defendants' motion.  We will, however, construe the plaintiff's verified complaint as an affidavit. *See Wilson v. Maben*, 676 F.2d 581, 583 (M.D. Pa. 1987)(if allegations in a verified complaint are specific and based on personal knowledge, the complaint should be treated as an affidavit in support of or in opposition to a motion for summary judgment).

After reviewing all the evidence before us - the allegations in the complaint, the declarations submitted by the defendants and the videotape, we find that the plaintiff was not under imminent danger at the time of the incident. Although force was used on the plaintiff the force was minimal. Moreover, it is clear that the plaintiff could have avoided the use of force or stopped the use of force simply by complying with the orders to stand up and have his handcuffs removed. We do not find credible the plaintiff's allegation that he was in danger of retaliation from the officers for filing the instant complaint.

18

The plaintiff is not entitled to proceed *in forma pauperis*, and his *in forma pauperis* status will be revoked.

AND NOW, this 22nd day of April, 1999, **IT IS HEREBY ORDERED** that the plaintiff's motion (doc. 27) for leave to file a brief in excess of fifteen pages is **GRANTED**. **IT IS FURTHER ORDERED** that the defendants' motion (docs. 18 & 20) to revoke the plaintiff's *in forma pauperis* status and to defer filing a responsive pleading is **GRANTED**. The Order of December 1, 1999, granting the plaintiff's application to proceed *in forma pauperis* is **VACATED**. **IT IS FURTHER ORDERED** that the plaintiff shall pay the full $150.00 filing fee within twenty days of the date of this Order. If the plaintiff fails to pay the filing fee within this time, it will be recommended that this case be dismissed.

J. Andrew Smyser
Magistrate Judge

Dated: April 22, 1999.

19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN RICHARD JAE,                                        :
                                                         :
        Plaintiffs                          :    Civil Action No. 01-0041
                                                         :
        v.                                  :
                                                         :
C.O. LESTER,                                             :
                                                         :
        Defendant                           :

## CERTIFICATE OF SERVICE

I hereby certify that I am this day forwarding a true and correct copy of the

Defendant's Brief in Support of Motion to Revoke Plaintiff's In Forma Pauperis Status and

Stay of Proceedings upon the person(s) in the manner indicated below:

Service by first-class mail
Addressed as follows:

John Richard Jae, BQ3219
SCI-Greene
175 Progress Drive
Waynesburg, PA  15370

_____
Alonda N. Bailey
Clerk Typist 2

PA Department of Corrections
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444

Dated:  April 10, 2001