JUDGE'S COPY

FILED

OCT 16 2001

HARRISBURG, PA.     DEPUTY CLE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN RICHARD JAE,        :

        Petitioner,       :

                    :      Civil Action No. 1:01-CV-0041

        v.            :

                    :      (Judge Rambo)

CORRECTIONS OFFICER LESTER,:

                    :      (Magistrate Judge Smyser) ✓

        Respondent.     :

## RESPONDENT'S BRIEF IN OPPOSITION
## TO PETITIONER'S PETITION FOR WRIT OF MANDAMUS

### FACTS

On January 10, 2001, Petitioner, John Richard Jae (hereinafter "Jae") filed a

Complaint in your Court, invoking the Court's jurisdiction pursuant to 42 U.S.C.

Section 1983. As part of his Complaint, and in compliance with 42 U.S.C. Section

1983 and 42 U.S.C. 1997(e), Jae listed the numerous other lawsuits he has filed in

Federal Court while he has been incarcerated. Jae also acknowledged there is a

grievance procedure available at his institution. Jae alleges that he did file a

grievance, and that the grievance process is not completed because the institution

has refused to accept the grievance.  Jae also filed a Motion on January 10, 2001,
requesting *in forma pauperis* status.  In his Motion, Jae alleged he was under
imminent danger of serious physical injury pursuant to 28 U.S.C. §1915(g).  On
January 24, 2001 your Court granted Jae's Motion to Proceed In Forma Pauperis.

On February 22, 2001, your Court issued a Case Management Order in this
matter.  On March 27, 2001, Respondent Corrections Officer Lester (hereinafter
"Lester"), by and through his attorney, filed a Motion to Revoke Jae's *In Forma
Pauperis* Status pursuant to 28 U.S.C. §1915(g) because more than three of Jae's
prior Federal Complaints have been deemed frivolous, malicious or failed to state a
claim upon which relief can be granted and because Jae was not under imminent
danger of serious physical injury at the time the Complaint was filed.

On April 10, 2001, Lester filed his Brief in Support of Motion to Revoke
Jae's *In Forma Pauperis* status, and on April 25, 2001 Jae filed his first Motion for
Enlargement of Time to file his Brief in Opposition to Lester's Motion.  On April
27, 2001 your Court granted Jae's Motion for Enlargement of Time and ordered
that Jae's Brief be filed on or before June 22, 2001.

On June 20, 2001, Lester filed a Motion to Extend the Court's Case
Management Order by sixty days after the Court has ruled upon Lester's Motion to
Revoke Jae's *In Forma Pauperis* status.  On June 25, 2001, the Court granted
Lester's Motion to Extend the Case Management Order.

On June 27, 2001, Jae filed another Motion for Enlargement of Time in which to file a Brief in Opposition to Lester's Motion to Revoke Jae's *In Forma Pauperis* status. At the same time, Jae filed a Petition for Writ of Mandamus and Brief in Support thereof wherein he alleged he was unable to effectively respond to Lester's Motion to Revoke his *In Forma Pauperis* status because the Department of Corrections was "illegally withholding legal materials, court case filed papers and law books from him." (Jae's Brief in Support of Petition for Writ of Mandamus, p. 1). In this Petition, Jae asks the Court to order the Department of Corrections to return all of his legal materials, court files and law books to him and to further order the Department of Corrections to provide him with carbon paper and legal envelopes. Neither the Petition nor the brief were served on Lester or his attorney.

On July 5, 2001, the Court granted Jae's Motion to again extend the time for him to File a Brief in Opposition to Lester's Motion to Revoke his *In Forma Pauperis* status, extending Jae's deadline to file his brief to July 23, 2001. On July 27, 2001 Jae filed another motion to extend the time to file his brief in Opposition to Lester's Motion to Revoke his *In Forma Pauperis* status.

On August 6, 2001, the Court issued an order that on or before August 14, 2001 Lester was directed to either file a brief in Opposition to Jae's Petition for

Writ of Mandamus or a statement indicating he does not oppose the petition. This is the first notice to Lester of Jae's Petition for Writ of Mandamus.

On August 7, 2001, the Court granted Jae an additional Enlargement of Time to file his brief in opposition to Lester's Motion to Revoke his *In Forma Pauperis* status.

On August 16, 2001, Lester, by and through his attorney filed a motion requesting the Court stay proceedings as to Jae's Petition for Writ of Mandamus until such time as Jae properly served Lester and to grant Lester an Enlargement of Time to file a Brief in Opposition to Jae's Petition for Writ of Mandamus.

On September 18, 2001, the Court scheduled a hearing for October 10, 2001 to resolve the issue of proper service. On September 21, 2001, Lester waived service of Jae's Petition for Writ of Mandamus. On September 28, 2001, the Court issued an Order directing Lester to on or before October 18, 2001, either file a brief in opposition to Jae's Petition for Writ of Mandamus or a statement indicating that he does not oppose the Petition.

## QUESTION PRESENTED

I.   SHOULD JAE'S PETITION FOR WRIT OF MANDAMUS BE DISMISSED BECAUSE HE HAS FAILED TO ESTABLISH HIS RIGHT TO EXTRAORDINARY RELIEF?

Suggested Answer:  In the Affirmative.

# ARGUMENT

## I.    JAE'S PETITION FOR A WRIT OF MANDAMUS SHOULD BE DISMISSED BECAUSE HE HAS FAILED TO ESTABLISH HIS RIGHT TO EXTRAORDINARY RELIEF.

"Mandamus is an extraordinary remedy which is "to be granted only in extraordinary cases". *United States v. Ferri*, 686 F.2d 147, 152 (3d Cir. 1982) cert denied 459 U.S. 1211, 75 L.Ed 2d 446, 103 S.Ct. 1205 (1983) quoting *United States v. Olds*, 426 F.2d 562, 565 (3d Cir. 1970). To confine the issuance of a writ of mandamus to extraordinary circumstances, the Supreme Court has, as conditions of issuance, required the Petitioner "have no other adequate means to attain the relief he desires . . . and that he satisfies the burden of showing that his right to the issuance of the writ is clear and indisputable . . . *Kerr v. United States District Court*, 426 U.S. 394, 403, 48 L.Ed. 2d 725, 733, 96 S.Ct. 2119, 2124 (1976). Jae has failed to satisfy either prong of the *Kerr* test.

Jae has not shown he has no other means to attain the relief he desires. Jae has access to but has failed to utilize the Department of Corrections grievance procedure. However, if Jae did follow DOC policy and file a grievance, it is almost certain that if his grievance is denied, he will file another action pursuant to Section 1983 and again seek *in forma pauperis* status because he is in "imminent danger". Fortunately, the Court does not have to reach this issue in this action because Jae's Petition also fails the second prong of the *Kerr* test.

Jae has failed to show that his right to the issuance of the writ is clear and indisputable. What Jae has shown, through his Petition and brief, is that the alleged violations of his constitutional rights are simply permissible regulations designed to promote institutional security while causing minimum interference with an inmate's constitutional rights.

The United States Supreme Court has recognized that a prison regulation may validly impinge on an inmate's constitutional rights if the regulation is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 96 L.Ed. 2d 64, 107 S.Ct. 2254 (1986). Pursuant to the court's holding in *Turner* and its progeny the Department of Corrections has promulgated policy 6.3.1 §20(I)(1), (attached hereto as Exhibit A), which requires each "Facility Manager designee...designate an area where an inmate's property can be safely and properly secured for short or long term storage." 6.3.1 §20(I)(1).

Inmates keep their legal material and personal property in standard record boxes. The standard record boxes are 15" x 12" x 10" in size. 6.3.1 §20(B)(1)(j). Inmates in the "General Population" are allowed two record boxes or one footlocker for legal and personal material in his or her cell. 6.3.1 §20(C). However, inmates in the "Restrict Housing Unit" are only allowed one record box. DC-ADM 801(M)(5).

If an inmate exceeds the permitted amount of property in his or her cell, the inmate can request that "legal materials...be stored by the facility. [The] storage is only for legal material needed for active cases involving the inmate." 6.3.1 §20(I)(2). "The maximum storage permitted is five record boxes and the maximum storage time is twenty-four months" unless the inmate obtains permission from the administration. 6.3.1 §20(I)(3). "The minimum time frame for the exchange of [record] boxes [held in storage] shall be once every thirty days." 6.3.1 §20(I)(4).

In his brief, Jae acknowledges his materials are being held in the SMU property room and that he has access to the materials, ("prison officials here are illegally withholding his legal materials, court case file/papers and law books from him at the SMU property room and are refusing to allow him to have sufficient enough time to go thru [sic] such property boxes, locate and retrieve and take back to his cell with him, all of the legal materials, court case files and law books of his." (Jae brief, pp 1-2).) By Jae's own admission, he has access to his materials. His brief in support of his Petition for Writ of Mandamus is evidence that he has more than sufficient time to retrieve what he needs to respond to Lester's Motion to Revoke his *In Forma Pauperis* status.

In *Shaw v. Murphy*, the United States Supreme Court recently affirmed that a prison "regulation...reasonably related to legitimate pernological interests" is

valid, even if the regulation impinged the inmate's constitutional rights. *Shaw v.*

*Murphy*, 121 S.Ct. 1475, 1479 (2001), *quoting Turner, et al. v. Safley, et al.*, 107

S.Ct. 2254, 2261 (1987).

> (1) Is there a valid, rational connection between the prison regulation and the legitimate governmental interest;
> (2) Are there alternative means of exercising rights that remain open to prison inmates;
> (3) Will the regulation impact accommodation of the constitutional rights on guards and other inmates and on the allocation of prison resources;
> (4) Can the ready alternative accommodate the prisoner's rights with little cost.

*Turner*, 107 S.Ct. at 2261 (1987), *cited by Shaw v. Murphy*, 121 S.Ct. at 1479,
*citing Block v. Rutherford*, 104 S.Ct. 3227 (1984).

Other jurisdictions have applied the factors laid out in *Turner* and found that

an inmate's constitutional rights have not been violated when regulations prohibit

the amount of legal material permitted in an inmate's cell. *Savko v. Rollins*, 749

F.Supp. 1403 (Dist. Ct. Md. 1990).

In *Savko*, inmates initiated several actions because they were required to

keep legal material in 1.5 cubic foot box in their cell. The warden argued that the

1.5 cubic feet requirement was to, *inter alia*, "enhance prison security by

preventing the common practice of hiding contraband in books and papers." *Id.* at

1407. The court turned to *Turner* and determined that the defendant's explanation

was reasonable and served to promote a valid penological interest. *Id.* at 1408.

Responding to Plaintiffs' contentions "that the regulation infringes upon a

prisoner's right to access the courts by impermissibly restricting his or her time and opportunity to work on post conviction appeals and habeas corpus petitions." *Id.* at 1407, the court held "the state of Maryland's express interests in fire safety and prison security, manifested in DCR-220-6, are legitimate penological concerns...Plaintiffs are left with ample opportunities for access to the courts through established legal assistance programs, some prison libraries, and the monthly rotation system for in-cell legal materials authorized by DCR-220-6...Therefore, even if the 1.5 cubic feet limit does infringe in any way upon prisoners' protected rights, this court finds no constitutional impediment to its implementation under the *Turner* standards." *Id.* at 1406.

The most compelling evidence that Jae has been provided with everything he is constitutionally entitled to and which is necessary to respond to Lester's Motion to Revoke his *In Forma Pauperis* status is Jae's own brief in Support of his Motion for a Writ in Mandamus.  In his brief, Jae correctly names the Court, the caption, the docket number, the assigned Judge, the assigned Magistrate Judge, the date Counsel for Lester filed the Motion to Revoke Jae's *In Forma Pauperis* status, the date the brief in support thereof was filed, and the date Jae's brief in opposition to the motion was originally due to the Court.  Clearly, none of the documents relevant to this case have been withheld from Jae.

Jae further claims he cannot respond because he has been denied access to his personal law books.  Again, the Court need look no further than Jae's brief in support of Petition for Writ of Mandamus for compelling evidence that this claim is patently ludicrous.  In his brief, Jae cites over twenty-five cases from the United States Supreme Court, the various Circuit Courts and numerous District Courts. Jae not only uses the correct cites, he is able to quote several of the decisions at length and verbatim.  Jae also accurately cites to the United States Constitution and the Pennsylvania Constitution.  Although Lester strenuously argues that a careful reading of each of the cases Jae cites in his brief show that the facts in each case are distinguishable from Jae's action and do not stand for the propositions Jae asserts, the fact remains Jae has obviously had easy access to a more than adequate law library.

Jae further claims he was not provided with paper, carbon paper and envelopes.  This assertion raises the question:  If Jae was denied access to these materials, how did he draft his Petition for Writ of Mandamus and Brief in Support thereof and manage to file them with Your Honorable Court?  The materials, which he claims he has been denied but which were available to file his Petition for Writ of Manamus, could have just as easily been used to produce the brief Jae repeatedly insists he doesn't have the resources to prepare.

In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 491, 52 L.Ed 2d 72 (1977) the Court stated: "our decisions have consistently required states to shoulder affirmative obligations to assure all prisoner's meaningful access to the Courts. It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents." *Bounds* U.S. at 824-825 and providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. *Bounds* U.S. at 828. "Nevertheless, a legal access program need not include any particular element we have discussed and we encourage local experimentation. Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards. *Bounds* U.S. at 832. Again, the compelling evidence of Jae's own brief in support of his Petition for Writ of Mandamus establishes that the Department of Corrections has met and surpassed *Bounds* test.

The following quote from *Brownlee v. Conine*, 957 F.2d 353, which is one of the cases Jae cites in his brief, is directly on point to Jae's contentions here. "Indeed, a number of this prisoner's claims . . . fail to state a claim . . . also frivolous is the claim that the prisoner was not allowed to have hard cover law books . . . for he doesn't argue a lack of reasonable alternatives (such as) access to law books in the jails law library." *Brownlee* at F.2d 354.

11

In *Roman v. Jeffes*, 904 F.2d 192 (3d Cir. 1990), also cited by Jae, the Court noted that the Petitioner had filed several lawsuits in different jurisdictions (*Roman* F.2d at 197) and was claiming he was being denied all access to some of his legal materials because these materials had not been transferred with him when he was moved from the Northampton County Prison to the Lehigh County Prison.  Roman asserted his constitutional rights were being violated because the prisons would not let him transfer all his files and Lehigh County would only allow him to keep the materials relevant to his Lehigh County case.  *Id.* at 198.

The court stated "although it is not clear what Plaintiff means by "legal materials" if he is referring to legal research notes, copies of orders issued in cases in which he is involved or pleadings filed by opposing parties, it is clear that these materials are core materials, central to his right to access to the Courts." *Roman* at F.2d 198.  While the wording in Jae's Petition for Writ of Mandamus is carefully tailored in attempt to bring his claim within the purview of *Roman, supra*, the Motion and brief, by their detail and Jae's own admissions, conclusively establish Jae is not subject to the alleged constitutional deprivations the *Roman* court was addressing.

Like Roman, Jae is proceeding *pro se* in numerous cases in different jurisdictions.  At least twelve of these actions have not only been dismissed, but been dismissed as frivolous, malicious, or because they failed to state a claim upon

which relief can be granted. Obviously, nothing that could be classified as a core material in this action has been denied to Jae, and his Petition for a Writ of Mandamus is merely his most recent, but certainly not his last, frivolous pleading.

**CONCLUSION**

Jae has failed to establish a claim of deprivation under *Bounds* and its progeny and his Petition for Writ of Mandamus should be dismissed.

Respectfully submitted,
PA Department of Corrections,

Michael J. McGovern
Assistant Counsel
Attorney I.D. No. 52802
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA 17011
(717) 731-0444

Dated:    October 16, 2001

## Section 20 – Inmate Property

### A. Initial Reception

1. At the time of initial reception, the Property Officer or designee, in the presence of the inmate, shall inventory all state and personal property, using the **DC–153, "Inmate Personal Property Inventory"** form. A written list shall be kept in the **DC-15** and the inmate will receive a current copy of this list.[1]

2. The quantity of each item along with the method of disposition shall be indicated on the **DC-153**. Items not pre-printed on the form will be listed in the blank spaces. Special items shall include brand names, description and serial number, if applicable. An engraving tool must be used to mark the inmate's name and DC number on items where applicable.

3. All items retained by the inmate shall be thoroughly inspected for contraband and to assure that they meet sanitary and safety requirements. These items must be compatible with existing directives.

4. To preclude inadvertent damage, electrical or mechanical items must be in working order and not tampered with before packing for shipment.

5. Items to be retained by the inmate will be marked with an "R."

6. The inmate shall provide the name and address of the person to whom the facility should mail those items not being retained by the inmate. This information shall be reflected in the "Mail To" box on the **DC-153**. These items are to be marked with an "S." Inmates must sign a cash slip to pay for these items to be shipped.

7. Items to be destroyed will be marked with a "D." This includes non-working electrical/mechanical items.

8. Items to be placed in facility storage will be marked with an "H."

9. Form **DC-130B, "Cash Transaction Receipt"**, will be issued to the inmate for monies in his/her possession at the time of reception with the money deposited to the inmate's account.

10. Upon completion of the above procedures, the Property/Reception Officer will sign the **DC-153** form, indicate the facility and date, and will have the inmate sign that he/she has been advised of the disposition of his/her property. The Property/Reception Officer will give copy 4 to the inmate and copies 1, 2, and 3, shall be forwarded to the mailroom with those items to be shipped. At the time of shipping, the mail room employee shall sign and date the form. One copy should be retained by the sending facility in the event there are any discrepancies once the property arrives at the receiving facility.

---

[1] 3-4281

| EXHIBIT |
|---------|
| A |

*6.3.1, Facility Security Manual, Section 20 –Inmate Property*

## B. Transfers

### 1. General

    a. It is the responsibility of the Property Officer/designee at the sending facility, to search, inventory, pack, and label each inmate's personal property for shipment on the bus/van as follows:

        (1) All the inmate's property will be searched, inventoried, and packed by an officer in the presence of the inmate[2] using a **DC-153** "**Personal Property Inventory**" form.

        (2) The quantity of each item shall be indicated on the list along with the method of disposition. Items not pre-printed on the form shall be listed in the blank spaces. Special items shall include brand names, description and serial number, if applicable. The boxes shall be numbered i.e., 1 of 2, 2 of 2, etc

    b. Both the inmate and the officer will sign the **DC-153**. In those cases where the inmate cannot be physically present during inventory procedures or represents a security threat, two officers shall inventory and process the property and both officers will sign the **DC-153**. A notation will be made as to why the inmate was not present. The two officers will be responsible for sealing the boxes with sealing tape and signing their names over the tape. The boxes shall be numbered i.e., 1 of 2, 2 of 2, etc.

    c. The Property Officer/designee will ensure that three sets of facility clothing are packed with the property that is to accompany the inmate.

    d. If the inmate has a wedding band, it will be inventoried and noted on the packing slip, however the inmate may wear his/her wedding band during the transport. The inventory should reflect if the inmate is or is not wearing the wedding band. The wedding band must be plain and no gem stones are permitted.

    e. Prescribed medications should not be packed with the inmate's property.

    f. All medication(s) and the medication administration record shall be sealed in a manilla envelope by a drug room nurse and clearly labeled with the inmate's name and DC number and forwarded to the Medical Record Director/designee for final preparation with the medical record.

    g. The Medical Record Director/designee shall place the medication envelope in the transfer envelope labeled: To SCI-_____

    h. Medication(s) shall be hand carried by the transport officers and given to the officer in charge at the receiving facility or to transport officers if the inmate is being transferred to another transport bus/van.

    i. The Medical Record Director/designee shall deliver the transfer envelope for transfer with the inmate to the facility's designated area and transport officers.

---

[2] 3-4281

j. All facilities shall purchase the standard Records Boxes from Correctional Industries (size 15" x 12" x 10") for inmate property transfer use. This does not include the TV box. If additional boxes are required, the inmate will be charged for the boxes.

k. The staff member that conducts the inventory shall permit inmates a maximum of two (2) Records Boxes and a television box for shipment on the bus/van. One standard size footlocker may be substituted for the two boxes. If the inmate's personal property requires additional standard boxes, the inmate shall be informed that additional boxes will be shipped by the least expensive common carrier available (U.S. Mail, UPS, etc.) to the receiving facility at the inmate's expense.

l. Inmates will be permitted one (1) additional box for a television set. Televisions should be securely packed either in the original container or in a box supplied by the facility with appropriate packing material. If the original box and packing material is not used, the box containing the television should be clearly labeled as containing a television set.

m. Inmate clothing may also be used to secure or pad the television. When inmate property is used for packing material, the box shall be marked accordingly, on the outside of the box e.g., "This box contains one television and inmate clothing has been used for packing". The property used as packing should be noted on the inventory sheet.

n. Oversized boxes may not be used to accommodate additional personal property.

o. Every container of property that is to accompany an inmate on the bus/van should be secured with tape and labeled with the inmate's name, DC number, sending facility and receiving facility. Labeling shall include the total number of containers preceded by the count number of that particular container, (i.e., 1 of 3, 2 of 3, 3 of 3, etc.). An exact count of all containers must be maintained throughout the trip, especially when travel to more than one facility occurs. Bus/van transportation staff shall maintain strict accountability of property.

p. An inventory form, **DC-153**, shall be completed by the sending facility and packed inside container number one. Inventory forms shall include only the property being shipped on the bus/van with the inmate. If additional containers are to be shipped via common carrier, a separate form should be prepared for this property.

q. At the receiving facility, the Property Officer, in the presence of the inmate, shall unpack and compare the items with the inventory form. The Property Officer and the inmate shall sign the form, indicating that all items have been received. Copy two will be given to the inmate. Copy one will be forwarded to the Record Office for filing.

r. All inmates transferred to SCI-Camp Hill for release to the Immigration and Naturalization Service will only be permitted to take legal material pertaining to their immigration case. All other personal property will be processed and sent home at the inmate's expense by the transferring facility. Basic hygiene items will be supplied by SCI-Camp Hill during their temporary stay.

## 2. Transportation Staff

a. Bus/van transportation staff will be responsible for the boxes and record packets to be delivered to the receiving facility.

b. Inmate property is to be stored only in designated inmate property areas on buses/vans. It shall never be stored within reach of the inmates being transported.

c. Bus/van transportation staff shall list the following information in a property log and have the sending facility's Property Officer/designee sign the log.

    (1) inmate name;
    (2) inmate D.C. number;
    (3) date;
    (4) name of sending facility;
    (5) number of property containers;
    (6) number of records packets;
    (7) transportation staff signature;
    (8) sending staff signature; and
    (9) receiving staff signature.

d. If records and property change bus/van before final destination, the receiving transportation staff shall sign the bus/van log for those items received.

e. If inmates are transported directly from one facility to another, the Property Officer/designee will sign the bus/van property log at the receiving facility.

## 3. Special Unit Transfer

a. In the case of a transfer to a special unit within the facility, each facility will be responsible for developing local procedures for securing and storing items which are not permitted.

b. In the event of an extended transfer for a medical stay, whether in an facility infirmary or outside hospital, each facility will be responsible for developing local procedure for the safe handling and storage of any inmate property.

c. Inmates processed for admission to the SCI-Waymart Forensic Treatment Center, SCI-Waymart Special Assessment Unit, or a Mental Health Unit are only permitted to bring legal material. All other personal property must be packed and stored at the home facility.

## C. Inmate Legal Property

No more than two (2) records boxes or one (1) footlocker are transported with the inmate at facility expense. Additional boxes are shipped at the inmate's expense. Exceptions to this policy may be made for indigent inmates and **only** for excess legal materials. Shipping costs will be charged to the inmate's account.

**D. Determination of Indigence**

A distinction shall be made between inmates whose indigence is self-caused and those who are indigent despite their own best efforts. Examples are as follows:

a. Self-caused indigence includes inmates who refuse to work, have deliberately exhausted their facility account or long term disciplinary custody cases.

b. Indigence which is not self caused includes inmates who are unable to work, administrative custody inmates who are not in this status as a result of their own behavior or inmates who make legitimate payments for outside obligations in accordance with Department policy DC-ADM 005, **"Collection of Inmate Debts."**

c. The inmate is responsible for requesting and justifying possible indigent status by notifying the Business Manager in writing of his/her possible indigent status.

d. The Business Manager shall submit his/her recommendation of whether the inmate meets the criteria for indigence to the Facility Manager of the sending and receiving facilities.

e. The Facility Manager will notify the inmate of the outcome.

**E. Qualifying Excess Quantity Legal Material**

a. Legal material shipped for indigent inmates must be part of an active/open case, actually pending before a court, to which the inmate is a party. Any questions regarding the status of an inmate's case can be directed to the Office of Chief Counsel. In order to determine the status of the case, Chief Counsel's Office must be provided with the court and docket number of the case.

b. The only legal material permitted will be court filings, transcripts, notes of testimony, and notes prepared by the inmate. This does not include reference materials, books, or photocopied cases.

c. Excess legal material will be stored in a separate box marked "Legal Materials Only."

**F. Shipping Excessive Quantities Of Legal Material**

a. If an inmate has more than the two (2) boxes of allowed and approved excess legal materials, the box or boxes containing basic issue personal items and the legal materials to fill the two (2) "free" boxes will be transported with the inmate. The legal materials shall be included as personal items.

b. If there is space available on the bus/van for additional boxes, the inmate(s) approved excess legal materials may be transported. If there is no space available, the excess boxes will remain at the sending facility for shipping at a later date.

c. The sending facility shall first attempt to transport any remaining boxes via other Department vehicles going to the receiving facility. If this cannot be arranged within thirty

(30) calendar days from the inmate being transported, the sending facility shall ship the remaining boxes by the least expensive common carrier available (U.S. Mail, UPS, etc.) to the receiving facility at the inmates expense unless he/she meets the criteria as indigent.

## G. Authorized Temporary Absence

1. In the case of an Authorized Temporary Absence (ATA), the inmate will be furnished standard Correctional Industries Record Boxes in which to pack personal property. The boxes will be returned to the Property Office upon return from ATA.

2. All personal property will be packed by the inmate prior to leaving, if possible, and placed in an orderly manner in the unit property storage area, the property room, or other designated secured area.

3. When the boxes are sealed the inmate or the two officers will be required to sign his/her full name over the tape so that it can be determined whether the boxes have been opened. The boxes shall be numbered, i.e., 1 of 2, 2 of 2, etc.

4. Housing Unit Staff will provide the inmate with a **DC-153 "Inmate Personal Property Inventory"** indicating the number of boxes, including footlocker.

5. The inmate will sign the receipt stating that he/she self-packed (or not) his/her property and that all property is accounted for.

6. The receipt will list the inmate's name, inmate's number, number of boxes, and the location where the property will be stored.

7. The boxes will remain at the facility and placed in proper storage.[3]

8. In those cases where an inmate refuses to sign the appropriate forms, two officers will process the property and certify that the inventory is correct. A notation shall be made on the **DC-153** that the inmate refused to sign the form.

9. The following items will be documented in the Inmate's Property Inventory and will be allowed to be packed by the inmate and taken from the facility for all ATA's unless the receiving facility or county facility restricts specific articles:

    a. Toilet Articles

    | | |
    |---|---|
    | 1 bar soap; | 1 comb or pick; |
    | 1 shampoo; | 1 facial medication; |
    | 1 washcloth; | 1 pair shower shoes; |
    | 1 body lotion; | 1 toothbrush; |
    | 1 hair dressing; | 1 toothpaste; and |
    | 1 deodorant; | Feminine Hygiene Products (if needed). |

---
[3] 3-4157

b.  Clothing (All clothing will be facility issue)

> 3 T-shirts;
> 3 pants;
> 3 undergarments; (for females 3 bras and 5 panties);
> 3 pair of socks;
> 1 pair of footwear;
> 1 coat; and
> 2 handkerchiefs.

c.  Miscellaneous

| | |
|---|---|
| 1 watch; | 1 address book; |
| 1 wedding band, plain, no stones; | medically approved prosthetic device(s); |
| 1 pair of eyeglasses or contact lenses w/storage container and solutions; | 10 photographs; 6 personal correspondence; |
| 1 each, pen or pencil; | 1 religious book; |
| 1 religious medal (1 ¼" diameter; 22" | 4 unopened packages of tobacco products a non-returnable; (none when transferring to |
| Maximum. length of chain); | non-smoking facility); and |
| 1 pair of dentures w/storage container; | pipe; (none when transferring to a non-smoking facility). |

Upon an inmate's return to the facility from ATA, only those articles and amounts that are documented on the Inmate's Property Inventory will be allowed back into the facility.  Any excess or opened tobacco products will be mailed out at the inmate's expense or destroyed.

## H.  Furlough, Parole or Final Discharge Maximum Expiration (FDME)

### 1.  Clothing

a.  It is the inmate's responsibility to obtain and have suitable clothing available to be worn for furlough, parole, or final discharge maximum expiration (FDME). The following guidelines will apply:[4]

b.  Items of furlough clothing will be limited to:

| | |
|---|---|
| 1 shirt; | 1 pair of undergarments; |
| 1 pair of trousers or jeans; | 1 pair of footwear; |
| 1 coat or jacket (if seasonally appropriate); | 1 pair of socks; |
| 1 hat (if seasonably appropriate); | 1 pair nylons (females); |
| 1 pair of gloves (if seasonally appropriate); | 1 bra (females); |
| | 1 skirt and blouse or 1 pr. of pants and 1 shirt (females) |
| 1 T-shirt; | 1 dress (females) |

---

[4] 3-4393

c.  The only other personal property to be taken out on a furlough will be the following:

| | |
|---|---|
| 1 pack of unopened tobacco products; | 1 pair of eyeglasses; |
| | 1 religious medal; |
| 1 watch; | Medically approved prosthetic device(s); |
| 1 wedding band (plain, no stones); | Medications (prescribed). |

d.  This information will be documented on the **DC-153** and will be filled out by the Intake Officer and used as reference when the inmate returns.

e.  In the instance where clothing is provided from the outside, the inmate's counselor will provide the inmate with a Clothing Request Form (Attachment A) to be sent to the inmate's family.

f.  Clothing that is mailed to the facility may not be received more than thirty (30) days prior to the inmate's verified furlough or release and must be clearly identified by the sender as furlough, parole or FDME clothing.  All clothing received in this manner will be thoroughly searched before entering the facility.

g.  The inmate shall be allowed the opportunity to try the clothing on ahead of time.

h.  Inmates must provide notification to the sender of correct clothing size to ensure that all clothing received will be ready to wear. Altering, repair, and/or cleaning of clothing will not be provided by the facility.

i.  On the date of the furlough, parole, or FDME, the inmate will report to the designated area, be processed, strip searched, and change into his/her furlough, parole, or FDME clothing.  At no time will clothing be given to the inmate before the actual release procedure.  For inmates on furlough, facility clothing will be tagged with the inmate's name and number and remain in the Intake Area.

j.  Upon the inmate's return from furlough, the furlough sponsor/driver will be given the clothing following the inmate's strip-search and clothing exchange.  The inmate will change back into facility clothing.

k.  If the sponsor/driver departs before taking receipt of the clothing, it is the inmate's responsibility to pay the cost of mailing the clothing or the items will be destroyed.

l.  **IN NO CASE** will an inmate be permitted to bring any type of furlough clothing, footwear, or religious book(s) back into the facility.

m.  The only personal property allowed back into the facility would be those items documented on the Inmate's Property Inventory, excluding tobacco products and medications.

n.  Any and all other clothing or personal property in excess of the above list will be returned at the inmate's expense or destroyed. Any additional items that the inmate may attempt to introduce into the facility will be treated as contraband.

2. **Parole/FDME**

   a. If transportation for parole or release is to be by private vehicle, the inmate's family may bring the inmate's clothing to the facility on the date of furlough, parole, or FDME. The Administration Lobby Officer or Main Gate Officer will accept the clothing and notify the Intake Officer.

   b. If the inmate is leaving on parole or FDME by private vehicle, the inmate may take his/her personal property with him/her.

   c. Inmates using public transportation to leave on parole or FDME will be permitted to have their clothing and personal property mailed out at their expense.

   d. Inmates are not permitted to take more property then can be reasonably carried on public transportation.

I. **Storage of Property**

   1. Each Facility Manager/designee will designate an area where an inmate's property can be safely and properly secured for short or long term storage.[5] No property may be stored by the sending facility for inmates being permanently transferred. Property will be stored by the sending facility only for inmates on Approved Temporary Absence.

   2. An inmate is permitted to request that legal materials exceeding the property limits permitted in his/her cell to be stored by the facility. This storage is only for legal materials needed for active cases involving the inmate. Any questions regarding the status of an inmate's case can be directed to the Office of Chief Counsel. In order to determine the status of the case, Chief Counsel's Office must be provided with the court and docket number of the case.

   3. The maximum storage permitted is five (5) records boxes and the maximum storage time is twenty-four (24) months. However, the Facility Manager may approve the storage of additional boxes or additional storage time on a case-by-case basis.

   4. Each facility shall establish procedures and a schedule that permits an inmate to exchange a box(es) from his/her cell with a box(es) in storage. This exchange will not be for individual documents; it must be a box for box exchange. The minimum time frame for the exchange of boxes shall be once every thirty (30) days. The Property Officer/designee in charge of the storage area shall maintain a list of the inmates approved for such storage. An inventory of the number of boxes being stored, and when the boxes were placed or removed from storage shall be maintained at the storage area.

   5. In cases where an inmate requests an item presently held in storage and such items are permissible, a **DC-153** will be amended and signed by the Property Officer and inmate.

   6. If an inmate requests an item be shipped, a **DC-153** will be amended and signed by the Property Officer and inmate.

---

[5] 3-4157

7. In cases where an inmate requests that an item in his possession be placed in storage, a **DC-153** will be completed and signed by the Property Officer and the inmate.

## J. Unclaimed Personal Property

1. All unclaimed property is to be searched and packed and a complete inventory will be completed on a DC-53 by the facility Property Officer or designee.

2. The property shall be retained for a minimum of six months, at which time, the facility Business Manager will attempt to contact the inmate at his/her last known address. In the case of escape, time will be computed from the date of escape. In the case of other releases, time will be computed from the date of receipt of official notification from the court. If no response is received within 30 days of notification or if the inmate chooses not to have the property forwarded, the Department of Corrections will forward the property to the Pennsylvania Department of Treasury, Office of Unclaimed Property for disposal.

3. In case of an escape, the escapee's cell must be searched prior to packing personal property to see if there are indications as to the whereabouts of the inmate. The search will occur only after the Pennsylvania State Police have cleared the cell. The Intelligence Captain or designee will conduct the search. Items removed from the cell will be documented on a **DC-154A, "Confiscation Slip"**.

4. If the whereabouts of the inmate are **known**, the Facility Business Manager shall forward a letter by first class mail, return receipt requested, to the inmate. The letter will indicate that the Department has the property and will forward it, at the inmate's expense, to an address of his/her choice.

5. If the inmate's whereabouts are **unknown**, notification will be sent to the last known address. The inmate or former inmate should be advised that if no response is received within 30 days, or if he/she chooses not to have the property forwarded, it will be turned over to the Pennsylvania Department of Treasury, Office of Unclaimed Property for disposal. A copy of the letter and receipt shall be filed in the inmate's **DC-15**, to be kept the maximum period, in accordance with the retention schedule of the record.

6. When items indicate joint ownership (savings bonds, stock certificates, etc.) the Facility Business Manager will send a letter, by first class mail, return receipt requested, to the joint owner. This letter is to indicate that the Department has the property and will forward it, at his/her expense, to the address of choice. The joint owner will be advised that if no response is received within 30 days, or if he/she chooses not to have the property forwarded, the property will be turned over to the Pennsylvania Department of Treasury, Office of Unclaimed Property for disposal. A copy of the letter and receipt shall be filed in the inmate's **DC-15**, to be kept the maximum period, in accordance with the retention schedule of the record.

7. All property turned over to the Pennsylvania Department of Treasury, Office of Unclaimed Property will be inventoried by the Property Room Officer, using Form **DC-153**, with the following modifications:

    a.  Check the "other" block at the top of the form and add "PA Department of Treasury, Office of Unclaimed Property".

    b.  In the bottom right-hand block, add "PA. Department of Treasury, Office of Unclaimed Property". The receiving agent for the Treasury will sign for the received property in this section.

    c.  The Property Officer will sign his name and print his/her name and rank in the appropriate box after the inventory is completed.

    d.  Property held in storage or the facility safe, such as rings, watches, legal documents, will be added to the inmate's inventory.

8.  Property deemed unacceptable by the PA Department of Treasury will be disposed of by assigned facility staff. A Commissioned Officer, Facility Business Manager, and the Property Officer will witness the disposal of unacceptable property. This will be documented on the **DC-154A**. Examples of unacceptable property would be clothing (new or used), toiletries, personal care items, perishable foods. Phone inquiries may be made to the PA Department of Treasury, Office of Unclaimed Property to determine the worthiness of any item. A notation shall be made listing the time, date, and person contacted.

9.  Money in the inmate's account will be transmitted via check to the PA Department of Treasury, Office of Unclaimed Property. The check number and amount will be listed on the **DC-153**.

10.  The receiving agent from the PA. Department of Treasury is to sign the **DC-153**, as indicated, and be furnished two (2) copies. The other copies shall be filed in the inmate's record jacket and retained the maximum period, in accordance with the retention schedule of the record.

11.  Arrangements for the disposal of unclaimed property shall be made with:

> Department of Treasury
> Office of Unclaimed Property
> 217 Finance Building
> Harrisburg, PA 17120
> Telephone No. (717) 772-2957
> Facsimile      (717) 787-9079

# INMATE CLOTHING REQUEST FORM FOR
# FURLOUGH, PAROLE, OR FINAL DISCHARGE

**TO:** _____    **RELATIONSHIP:** _____

**INMATE'S NAME:** _____    **DC-NUMBER:** _____

When being released on furlough, parole, or as a final discharge, an inmate is permitted to wear his/her own suitable clothing in place of the clothing issued by the Commonwealth. Each inmate is responsible to obtain, and have available, suitable clothing to be worn by him/her when leaving the State Correctional Facility at _____. Clothing must be received no more than thirty (30) days prior to release. Upon return, if applicable, clothing and footwear must be given to the person listed above, sent home or destroyed. Please send me the following articles of clean clothing, as checked below, for my [  ] furlough, [  ] Parole, or [  ] Final Discharge. I will only be permitted the specific items indicated.

- ❑ One (1) Sport or Dress Shirt                          Size _____
- ❑ One(1) pair of trousers or jeans                      Size _____
- ❑ One (1) Skirt and blouse or One (1) Pants and shirt  or One Dress    Size _____
  (females only)
- ❑ One (1) Coat or Jacket (if seasonally appropriate)    Size _____
- ❑ One (1) Hat (if seasonally appropriate)               Size _____
- ❑ One (1) Pair of gloves (if seasonally appropriate)    Size _____
- ❑ One (1) T-Shirt                                       Size _____
- ❑ One (1) Pair Undershorts                              Size _____
- ❑ One (1) Bra (females only)                            Size _____
- ❑ One (1) Pair Shoes or Sneakers                        Size _____
- ❑ One (1) Pair of nylons (females only)                 Size _____
- ❑ One (1) Pair Socks                                    Size _____

Comments:
_____
_____
_____
_____

These items must be received by me no later than: _____

You may deliver the clothing to the Administration Lobby on the day of my release or you can mail these items to me at the following address:

My Name and DC Number
C/O State Correctional Facility at

_____
_____
_____
_____

Only suitable, clean clothing will be accepted and **only the items checked will be permitted. No other items will be accepted.**

Approved By: _____    Date: _____

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date served a copy of the below-referenced document(s) upon the person(s) and in the manner indicated below:

Service by first class mail, postage prepaid, addressed as follows:

John Richard Jae, BQ-3219
SCI-Greene/SMU
175 Progress Drive
Waynesburg, PA 15370

*Corinne N. Driver*

Corinne N. Driver
Clerk Typist II
PA Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA 17011
(717) 731-0444
Fax: (717) 975-2217

Dated: 10/16/01

Re:    Respondent's Brief in Opposition to Petition
       *John Richard Jae v. Corrections Officer Lester*, USDC-MD 1:01-CV-0041