IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN RICHARD DAE,
 Plaintiff,

vs.

CORRECTIONS OFFICER LESTER,
 Defendant.

FILED
HARRISBURG, PA
JAN 7 2002
MARY E. D'ANDREA, CLERK
Per _____

CIVIL NO. 1:01-CV-...
(Judge Rambo)
(Magistrate Judge Smyser)

PLAINTIFF'S WRITTEN OBJECTIONS TO THE U.S. MAGISTRATE JUDGE'S REPORT AND RECOMENDATION OF DECEMBER 10, 2001

COMES NOW, the Plaintiff & Pro Se Counsel in the above-entitled civil action, John Richard Dae, as a layman unlettered in the arts & sciences of legal procedures within the United States, & now files his Plaintiff's Objections to the U.S. Magistrate Judge's Report and Recomendation of December 10, 2001, pursuant to Fed. R. Civ. P. 72(b) & M.D. LR 72-3 & who, over, deposes & states:

1. The Plaintiff, John Richard Dae, a state prisoner proceeding pro se, commenced this 42 U.S.C. §1983 civil rights action by filing a complaint on January 10, 2001, alleging that the defendant, a corrections officer at the State Correctional Institution at Camp Hill RHU, used excessive force on him August 23, 2000. Plaintiff's request for leave to proceed in forma pauperis was granted on January 25, 2001.

2. On March 27, 2001, the defendant, Corrections Officer Lester, by attorney, filed his motion to revoke Plaintiff's in forma pauperis status & to stay the proceedings, herein this case. Defendant Lester, by counsel, filed his brief in support of that motion on April 10, 2001.

3. On June 27, 2001, the Plaintiff filed a petition for writ of mandamus and in support in this case.

4. Defendant Lester's brief in opposition to Plaintiff's petition for writ of mandamus...

5. On November 7, 2001, U.S. Magistrate Judge J. Andrew Smyser of this Court, entered his order, denying plaintiff's petition for Writ of Mandamus, granting Defendant Lester's motion to revoke the plaintiff's In Forma Pauperis status and vacating the Order of January 2001 granting the plaintiff's request to proceed in forma pauperis and further ordering that on or before November 27, 2001, the plaintiff shall pay the entire $150 filing fee and that if the plaintiff fails to pay the filing fee, it will be recommended that this action be dismissed.

6. On December 10, 2001, U.S. Magistrate Judge Smyser filed his Report and Recommendation that plaintiff has not paid the filing fee as ordered and recommending that the case be dismissed and that the case file be closed.[1]

7. Tris is plaintiff's written objections to the U.S. Magistrate Judge's Report and Recommendation of December 10, 2001, herein.

I. PLAINTIFF'S CONSTITUTIONAL CHALLENGE TO THE PRISON LITIGATION REFORM ACT AND § 1915(g).

In his November 7, 2001, Order, herein this case, U.S. Magistrate Judge Smyser, based upon 28 U.S.C. § 1915(g), states & holds that:

> Because the plaintiff has had at least three cases or appeals dismissed as frivolous, malicious or for failure to state a claim, see DOC-2 at 3, he may not proceed in forma pauperis in this action unless he is under imminent danger of serious physical injury. 2/

Plaintiff specifically objects to the above-holding of the U.S. Magistrate Judge, because such is based upon 28 U.S.C. § 1915(g) and 28 U.S.C. § 1915(g) unconstitutionally denies a prisoner-plaintiff his 1st, 5th & 14th Amendments, U.S. Constitutional rights to access to the courts and to equal protection and due process of the law, as full

---

[1] Due to the fact that this plaintiff on December 11, 2001 was transfered to the Mental Health Unit at SCI- ___ from SCI-Greene, he did not actually receive the U.S. Magistrate Judge's Report until ___

a. Prisoners Have A Fundamental Right of Access To The Courts To challenge The Conditions of Their Confinement.

Plaintiff avers & submits that 28 U.S.C. §1915(g) ("commonly referred to as the 'three-strikes provision'") unconstitutionally burdens the affected prisoners' fundamental right to have meaningful access to the federal courts to challenge the conditions of their confinement. Moreover the provision is much broader than necessary to achieve the intended reduction in frivolous prisoner litigation, and brings within its broad sweep meritorious claims as well as frivolous claims. Thus, it could result in repeated violations of the affected prisoners' civil right while they serve their sentences.

### 1. Evolution of Prisoners' Right of Access to the Courts

In Smith v. Bennett, 365 U.S. 708 (1961), the U.S. Supreme Court held that a state could not refuse to accept an indigent prisoner's petition for writ of habeas corpus in the state court because the prisoner could not pay the four dollar filing fee. Smith, 365 U.S. at 712. While the Smith Court agreed that a state need not provide habeas review, once a state provides such review, it cannot deny indigent prisoners access to such review merely because they are unable to afford the filing fee. (Smith, 365 U.S. at 712.)

In Wolff v. McDonnell, 418 U.S. 539 (1974), the Court expressly rejected the state's assertion that the right of access to the courts did not extend to civil rights actions. (Id. at 579) The Court noted that there was no clear distinction between civil rights claims and habeas petitions because

> both actions serve to protect basic constitutional rights. The right of access to the courts... is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than does the Great Writ. The recognition by this court that prisoners have certain constitutional rights which can be protected by civil rights actions would be diluted if inmates, often in totally a

functionally illiterate," were unable to articulate their complaints to the courts. 4/

In the late 1970s, the court made clear in Bounds v. Smith, 430 U.S. 817 (1977), that the obligations of the states extended beyond a mere prohibition against establishing impediments to prisoners' access to courts, but required that they shoulder affirmative obligations to assure all prisoners meaningful access to the courts. (Id. at 824-25) As a consequence, the court observed that the states had to provide indigent inmates with writing instruments, notary services, postage, transcripts, and were required to forego collection of docket fees. (Id.) These affirmative obligations were not limited to criminal appeals and habeas petitions, but extended to civil rights claims as well. The court noted that it has "consistently emphasized," habeas corpus and civil rights actions "are of fundamental importance ... in our constitutional scheme because they directly protect our most valued rights." 5/

Since the early 1990s, the fundamental nature of the prisoner's right of access to the courts has been rendered beyond debate. The Supreme Court has conclusively stated that the "federal courts must take cognizance of the valid constitutional claims of prison inmates," 6/ and that as a result of the fact that "a prisoner ordinarily is deprived of the privilege to vote, the right to court action might be said to be his remaining 'most fundamental political right, because preservative of all rights.'" 7/

___

4/ Id. As the Third Circuit recently observed in Brereton v. Reno, 59 F.3d 1445, 1452(3rd Cir 1995), aside from the Due Process Clause, another basis for constitutional right of access to courts is the First Amendment right to petition the government for grievances. Id. at 1452-53 (citing California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508,510 (1972); Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983) (declaring that "right of access to the courts is an aspect of the First Amendment right to petition")). See also Bordella v. Delo, 972 F.2d 204, 219 n.9 (8th Cir 1992) (finding the right of access may also stem from equal protection rights under Fifth and Fourteenth Amendments and First Amendment right to petition).

5/ Id. at 827 (quoting Wolff, 418 U.S. at 579; Johnson v. Avery, 393 U.S. 483, 485 (1969)); see also Procunier v. Martinez, 416 U.S. 396, 419 (1974) ("The constitutional guarantee of due process of law has as a requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights.").

6/ McCarthy v. Madigan, 503 U.S. 140, 153 (1992) (quoting Turner v. Safley, 482 U.S. 78, 84

7/ Id. (quoting Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886); see also Adams v. Carlson, 488 F.2d 619, 630 (7th Cir 1973)

In Lewis v. Casey, 116 S.Ct. 2174 (1996), the Supreme Court reaffirmed unequivocally that the right of access includes not only the ability to pursue criminal appeals and post-conviction relief, but also extends to civil rights actions to vindicate basic constitutional rights. 8/

II. Is There A Fundamental Right to In Forma Pauperis Status?

Permitting indigents free access to the courts dates back to Magna Carta. 9/

Following this tradition, Congress enacted the first Federal In Forma Pauperis Statute in 1892. 10/ The purpose of this statute was to guarantee that no citizen would be denied opportunity to commence, prosecute or defend a civil or criminal action in the courts of the United States merely because their poverty makes them unable to pay the filing fees or secure the costs. 11/ The Supreme Court has not yet directly addressed the issue of whether are tools that must be provided to indigent prisoners so they are able to challenge the conditions of their confinement or to vindicate their constitutional rights includes waiver of filing fees in federal civil rights actions. However, there is no doubt that the federal government must pay prepayment of filing fees for habeas petitions by indigent prisoners. 12/ Given the equal importance of civil rights cases and habeas petitions in the constitutional scheme, it therefore seems logical to assume that meaningful access to the courts to pursue civil rights claims also would require that government waive filing fees for indigent prisoners. Analysis of the case law bears out this assumption.

An examination of the cases in which the Supreme Court has considered whether the filing fees is waived for indigent litigants supports a conclusion that such fees generally must be waived federal courts, at least for civil rights cases filed by prisoners challenging the conditions of their confinement. The rationale of these decisions strongly suggests that pauper status is a necessary tool that government must provide when the indigent prisoner seeks access to the courts in order to vindicate a fundamental right. Starting with the criminal appeal and habeas corpus cases the courts have consistently held that the constitution requires states to waive filing & transcript fees for indigent litigants in order to "...All others are illusory without it."

---

8/ Id. at 2181 - 82 (citing Wolff, 418 U.S. at 579.)
9/ "To no man will we sell, to no one will we deny right or justice." Magna Carta (sec. 40 (Holt trans. 1965); see Wayne A. Kalkwarf, Petitions to proceed in forma pauperis: the erosion of in forma pauperis from time of Magna Carta. In re McDonald and Neitzke v. Williams, 24 Creighton L. Rev. 803, 803-06 (1991) (recounting history of in forma pauperis from time of Magna Carta.
10/ Act of July 20, 1892, ch. 209, §1, 27 Stat. 252.
11/ Adkins v. E.I. Du Pont de Nemours & Co., 335 U.S. 331, 342 (1948). Congress's overarching goal in enacting in forma pauperis status was "to assure equality of consideration for all litigants." See Coppedge v. United States, 369 U.S. 438, 447 (1962) (citing H.R. Rep. No. 1079, 52d Cong. 1st Sess. 1 (1892).
12/ Smith v. Bennett, 365 U.S. 708, 712 (1961).

ensure equal access to review of fees in criminal appeals and habeas petitions. Waiver of fees is a tool necessary for those litigants to vindicate their most basic fundamental rights.

In Boddie v. Connecticut, 401 U.S. 371 (1971), the U.S. Supreme Court held due process prohibited a state from denying access to the courts to a divorcing couple who unable to pay the filing fee because the state has a monopoly on the only legal means to adjust the fundamental private relationship of marriage. Id. at 380-83.

All citizens must have access to the process that the state establishes for dissolving a marriage.[13] Given the interest of states for the indigent, the court found no merit to Connecticut's argument justifying the filing fee as a measure to reduce frivolous litigation or as a mechanism of resource allocation and recoupment of costs.[14]

Because a fundamental right was at stake, the state could not close the courthouse to indigents seeking to vindicate that right.

In Little v. Streater, 452 U.S. 1 (1981), the Supreme Court held that due process required that states provide free blood tests when needed by an indigent in certain paternity proceedings. Without access to the blood test, the court observed the alleged father "lacks a meaningful opportunity to be heard."[15] Because the determination of familial relationships implicated a fundamental right, the state's financial interest in having the proceedings resolved at the lowest expense to the public was "hardly significant enough to overcome" that fundamental private right.

The court also noted that the paternity action more closely resembled the proceedings in Boddie than those in Kras[16] or Ortwein[17] due to the constitutionally significant interests and the lack of an alternative forum.[18]

Prisoners facing significant deprivations of their fundamental constitutional rights, such as right to be free from racial discrimination,[19] to marry,[20] to challenge

---

[13] The Boddie court reasoned that "a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party's opportunity to be heard." Id. at 380.

[14] The Boddie court also reasoned that "other alternatives exist to fees and cost requirements as a means of conserving the time of courts and protecting parties from frivolous litigation, such as penalties for false pleadings or affidavits, and actions for malicious prosecution or abuse of process, to mention only a few." Id. at 381-82.

[15] Id. at 16 (quoting Boddie v. Connecticut, 401 U.S. 371, 377 n.12 (1971)).

[16] Any reference here to Kras is to: ▬▬▬ United States v. Kras, 409 U.S. 434 (1973).

[17] Any reference to Ortwein is to: Ortwein v. Schwab, 410 U.S. 656 (1973).

[18] Id. at 16 n.12. The indigent father in Little was a state prisoner at the time of the proceedings. Id. at 3.

[19] Lee v. Washington, 390 U.S. 333, 334 (1968) (per curiam).

[20] See Turner v. Safley, 482 U.S. 78, 97-99 (1987).

their convictions,[21]/ to practice their religion,[22]/ to communicate with free persons,[23]/ to be free from cruel and unusual punishment,[24]/ are more like the indigent parties in Boddie, Streater and M.L.B. than those in Kras or Ortwein. Although prisoners are no doubt less sympathetic, and while free persons' rights may appear more sacred than prisoners' constitutional rights, unlike in Kras and Ortwein, the rights at issue in actions challenging the conditions of a prisoner's confinement are clearly fundamental.[25]/

Moreover, given that prisoners' other rights are diminished significantly, that the government is intimately involved in virtually every aspect of the prisoner's life, and that because of incarceration prisoners virtually have no ability to avoid the alleged constitutional deprivation, the right of access for prisoners may be even more fundamental than it is for free citizens. If, as the Supreme Court held in Lewis, prisoners must be given the "tools" necessary to challenge the conditions of their confinement, the filing fee, or its waiver, is the most necessary tool for indigent prisoners to pursue such a challenge. To provide prisoners with a law library, pens, pads, postage, and even access to qualified legal assistance, and then deny them the ability to actually file a complaint renders the other tools otherwise useless.

While many federal courts have observed that pauper status is not a tool that must be a privilege for which there is no guarantee, this view is generally belied by Boddie, Streater, M.L.B., which, when read in the context of Lewis and the other prisoner access to court cases, make clear that pauper's status is a tool that must be guaranteed to indigent prisoners when a fundamental right is at issue.[27]/

This conclusion is also supported by the decisions dealing with abusive indigent litigants who have filed numerous vexatious, harassing and frivolous complaints.

In many cases, federal courts attempting to control overly litigious and abusive litigants issued injunctions restricting further in forma pauperis filings by the abusive litigants. Some courts citing section 1915(g) analogize it to this practice of entering injunctions against abusive litigants, suggesting that section 1915(g) did little more than codify an already existing judicial practice. Unlike the broad sweep of section 1915(g), courts traditionally proceeded very carefully when issuing injunctive relief, mindful of the nature of the right that they were restricting.

---

[21]/ Smith v. Bennett, 365 U.S. 708, 712 (1961).
[22]/ O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).
[23]/ Thornburgh v. Abbott, 490 U.S. 401, 401-412 (1989).
[24]/ Whitley v. Albers, 475 U.S. 312, 319 (1986).
[25]/ Any reference here to M.L.B. is to M.L.B. v. S.L.J., 117 S.Ct. 555 (1996).
[26]/ See In re Green, 669 F.2d 779, 785 nn.17-18 (D.C. Cir. 1981) (noting that where fundamental rights at stake, access could not be barred by financial barriers, and "conversely where no fundamental right at stake, the Court has upheld financial barriers") (citing United States v. Kras, 409 U.S. 434 (1973)).

restricting with such injunctions, by first ensuring that the litigant was truly flagrant abuser and then entering narrow injunctions directed at the specific abuse. With the PLRA, however, Congress has taken a much broader approach that leaves no room for such individual discretion. The decisions of these courts that have granted injunctions generally demonstrate that, notwithstanding the belief that pauper status is a privilege, the courts recognize that infringement on the ability to proceed in forma pauperis places a substantial burden on the ability to exercise the fundamental right of access to the courts. See also Pickett v. City of Richmond, VA, 1993 U.S. LEXIS 22437, at 3 (4th Cir. Sept 2, 1993)(finding that requirement that defendant pay 5% of filing fee is ban against ever proceeding in forma pauperis in "potentially meritorious lawsuit," which effectively denies defendant's access to courts); ___ v. Alabama Pub. Serv. Comm'n, 936 F.2d 512, 517 (11th Cir. 1991)("In recent years courts have attempted to balance the various concerns and have determined that if the right of access means anything, it means that courts cannot construct blanket orders that completely close the courthouse doors to those who are extremely litigious."); In re Tyler, 839 F.2d 1290, 1294 (8th Cir. 1988)(concluding that "if he was to be prohibited from proceeding in forma pauperis in any case, his access to the court would be totally denied. . . . We reject this alternative as to strict a sanction to impose. . . .").

    b. Section 1915(g) violates Due Process And Denies Equal Protection Of The Law Under the Fifth and Fourteenth Amendments of the United States Constitution And Plaintiff's Rights Thereunder.

Section 1915(g) forecloses access to the federal court for the targeted class of indigent prisoner/litigants except in very limited circumstances. Thus, aside from the most extraordinary circumstances, Section 1915(g) radically reduces the role of federal courts in protecting the constitutional rights of prisoners, prohibiting in forma pauperis status for those prisoners who have had three prior dismissals for frivolousness or for failure to state a claim. This is unconstitutional.

Congress now has effectively closed the doors to the federal courts in all manner of constitutional claims for indigent prisoners with three strikes against them. Section ███ 1915(g) is not a facially neutral statute that has a disparate impact on indigents, but rather it specifically targets indigent prisoners, as opposed to all indigents, for different treatment and unequal protection.

27/ avenues to secure relief, he simply may not be required to pay a filing fee.").
28/ If the courts cannot construct blanket orders that completely close the courthouse doors to those who are extremely litigious, then ___

by the federal courts.[28] Because a prisoner's right of access to the courts is a fundamental right, and notwithstanding the fact that neither prisoners nor indigents are a protected class, wholesale foreclosure of a class of citizens from access to federal courts [requires] scrutiny under both the Equal Protection component and the Due Process Clause of the Fifth Amendment. Generally, if a statute burdens a fundamental constitutional right, then strict scrutiny is applied. This requires that the statute be narrowly tailored to serve a compelling interest.

Because Section 1915(g) burdens indigent prisoner's fundamental federal constitutional rights to have "adequate", "effective" and "meaningful" access to the courts, such requires application of strict scrutiny as to such.

In Reno v. Flores, 507 U.S. 292, 301-02 (1993), the Supreme Court [held] that "Fifth and Fourteenth Amendments' guarantee of 'due process of law'... include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest").

As the Supreme Court noted in M.L.B. v. S.L.J., that the access-to-court decisions decisions reflected both equal protection concerns [about] "fencing out" putative litigants and due process concerns related to the fairness of "state-ordered proceedings anterior to adverse state action." 117 S. 555, 566 (1996). .... In either case, to the extent that §1915(g) burdens a fundamental right, the analysis essentially will be the same under either component of the Fifth Amendment. As the court noted in Moffitt, 417 U.S. 600 (1974), "('Due process' emphasizes [fairness] between the state and the individual dealing with the state, regardless of how other individuals in the same situation may be treated." Id. (1974). "'Equal protection,' on the other hand, emphasizes [...]

[28] Harris v. McRae, 448 U.S. 297, 324 n.26 (1980) ("The equal protection component of the [...]

treatment by a state between classes of individuals whose situations are arguably indistinguishable." Id. Discussing the claim that due process required that indigent prisoners be appointed counsel on discretionary appeals, the Ross court noted that "[U]nfairness results only if indigents are singled out by the state and denied meaningful access to the appellate system because of their poverty." Id. at

Plaintiff avers & submits that herein this instant case, if it is dismissed because of his inability to pay the entire $150.00 filing fee upfront all at once he will be *unfairly* denied meaningful access to this federal court because of his poverty and that §1915(g) singles this Plaintiff, an indigent prisoner out, and that §1915(g) is *not* narrowly tailored to serve a compelling interest.

Given the above & foregoing, it should be clear that section 1915(g) is unconstitutional and that Congress abused its authority enacting such statute containing provisions that essentially tell affected indigent prisoners to go to the state courts, that the federal courts are no longer open to them, and that they alone will receive protection of the law. By withholding the most essential tool for challenging the prisoners' conditions of confinement, Congress unconstitutionally burdened the affected class of prisoners' right to meaningful access to the federal courts. After decades of liberal reforms broadening prisoners' rights, the pendulum of the prison reform movement has swung too far in the opposite direction. The three strikes provision should be struck down or modified to comply with the Constitution.

The U.S. Magistrate Judge thus revoked this Plaintiff's in forma pauperis status in this case based upon an unconstitutional federal statute and such order must, by law, be vacated by the District Judge & Plaintiff's IFP status must be restored herein this case, which must not be dismissed.

28- Cont'd: selected or reaffirmed a particular course of action at least in part because merely in spite of its adverse effects upon an identifiable group.") (internal quotes and citations omitted) (see also Paper v. Evans, 16 C. Ct. 1623, (1996)(holding

II. THE U.S. MAGISTRATE JUDGE ERRED IN APPLYING ABDUL-AKBAR v. MCKELVIE, 239 F.3d 307 (3d Cir. 2001) TO THIS CASE.

In his November 7, 2001, Order in this case sub judice, the U.S. Magistrate Judge, stated & held:

> The court must assess whether the prisoner was under imminent danger at the time the complaint was filed. Abdul-Akbar v. McKelvie, 239 F.3d 307, 312 (3d Cir. 2001).

✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳

> The U.S. Magistrate Judge also stated & held, therein, that: The plaintiff's claim that he was in imminent danger of serious physical injury at the time he filed his complaint because he could be assaulted again and because he has a heart condition is not consistent with known facts. By the time he filed his complaint, the plaintiff was housed at a different institution from the institution where the defendant allegedly assaulted him. Accordingly, pursuant to §1915(g) the plaintiff may not proceed in forma pauperis in this court in this case.

This Plaintiff specifically objects to the above-statements/holdings of the U.S. Magistrate Judge in this case; & he avers & submits such holdings/statements are clearly erroneous & contrary to the [law?] based upon the following facts & arguments.

On January 10, 2001, this Plaintiff commenced this Civil Rights Action filing his complaint. On January 25, 2001, this Court granted this Plaintiff's request to proceed in forma pauperis in this case.

At the time this plaintiff filed his complaint and at the time this [court] granted him leave to proceed in forma pauperis herein this case, [Gibbs] v. Roman, 116 F.3d 83 (3d Cir. 1997) was the controlling authority in this [circuit. See the U.S. Magistrate Judge's Order of November 7, 2001, at 2.]

and in Gibbs v. Roman, 116 F.3d 83 (3d Cir. 1997), the U.S. Court of Appeals for the Third Circuit, stated (held) that the court must assess whether the prisoner was under imminent danger at the time of the incident complained about.

However, in Abdul-Akbar v. McKelvie, 239 F.3d 307 (3d Cir. 2001), the Third Circuit held that the court must assess whether the prisoner was under imminent danger at the time the complaint was filed, overruling its prior decision in Gibbs v. Roman, as set forth above.

However, because Abdul-Akbar v. McKelvie, was not only decided by the Third Circuit after plaintiff had filed his complaint herein this case, but also several days after this court had granted the plaintiff's request for leave to proceed in forma pauperis in this case, and the Third Circuit did not hold that the new standard for determining imminent danger in Abdul-Akbar was to be applied retroactively to cases which had been filed before such decision/change in imminent danger standard, Gibbs v. Roman was the controlling standard to be applied in this instant case, the U.S. Magistrate Judge was required to determine whether this plaintiff was in imminent danger of serious physical injury at the time of the incident and under Gibbs v. Roman, not under Abdul-Akbar v. McKelvie.

Because the U.S. Magistrate Judge used the wrong standard of herein, to determine whether or not this plaintiff was under imminent danger of serious physical injury, this order of November 7, 2001, should and the District Judge should not adopt his Report And Recommendation of December 10, 2001, in this case, and should remand this case to the U.S. Magistrate Judge to determine whether or not this plaintiff was under imminent danger of serious physical injury at the time of the incident alleged in the complaint, under Gibbs v. Roman. (5)

RESPECTFULLY SUBMITTED
John Richard [?]
MR. JOHN RICHARD J.

Jae vs. Lester
Civil No.: 1:01-CV-0041
CERTIFICATE OF SERVICE

I certify that on the 28th of December, 2001, I served a true and correct copy of the within Plaintiff's Written Objections to the U.S. Magistrate Judge's Report And Recommendation of December 10, 2001, the person listed below, by way of U.S. 1st class mail, postage prepaid, and addressed to:

> Mr. Michael McGovern,
> Assistant Counsel
> Office of the Chief Counselor
> The Pennsylvania Department of Corrections
> 55 Utley Drive
> Camp Hill, PA. 17011

I also certify that on the 28th of December, 2001, I gave to prison officials here for mailing to this court, the original of the above-same document.

I certify under penalty of perjury and pursuant to 28 U.S.C. § 1746, the above is true and correct.

(s) _John Richard Jae_
MR. JOHN RICHARD JAE,
#BQ-3219
P.O. Box 99901
Pittsburgh, PA. 15233-01

Plaintiff and Pro Se Counsel

Dated/Executed On:
28th December 2001

At: Pittsburgh, Pennsylvania